**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF WISCONSIN**

---

BEN WANKERL, on behalf of himself
and all others similarly situated,

                    Plaintiff,        Case No.

      v.

KOHLER CO.,

                    Defendant.

---

## CLASS ACTION COMPLAINT

---

The allegations herein are based on personal knowledge as to Plaintiff's own conduct and are made on information and belief as to all other matters based on an investigation by counsel.

## <u>INTRODUCTION</u>

1.      Kohler manufactured and sold or offered for sale the Class Engines at issue here both nationwide and in Wisconsin. The Class Engines – also referred to herein as "Small SI Engines" – are small, nonroad, nonhandheld spark-ignition engines and encompass both Kohler's "Small Off-Road Engines" ("the SORE Engines") and Kohler's "Off-Road Large Spark-Ignition Engines" ("the LSI Engines") (collectively, the "Class Engines"). The SORE Engines produce or are designed to produce less than 25 gross horsepower, whereas the LSI Engines produce or are designed to produce greater than 25 gross horsepower.

2.      Manufacturers such as Kohler are prohibited from selling, offering for sale, introducing into commerce, delivering for introduction into commerce, or importing, any new engine unless that engine is covered by an EPA-issued Certificate of Conformity ("COC"). *See*

Clean Air Act § 203(a), 42 U.S.C. § 7522(a).  It is also a violation to cause any of the foregoing acts.[1]

3.        In late 2015 and early 2016, Kohler self-disclosed emissions violations to the EPA and CARB.  Between then and January 30, 2020 – when the EPA, CARB, and Kohler publicly filed a consent decree – there was a secret undertaking to investigate, identify, and address the violations, including by commissioning a third-party audit of its internal emissions testing laboratory in 2016.  At no time did Kohler disclose to Plaintiff and Class members the existence of the Emissions Violations, let alone undertake any effort to recall, repair, replace, or otherwise remedy the Class Engines' Emissions Violations.

4.        As the EPA and CARB detailed, Kohler failed to comply with the Applicable Emissions Requirements, as detailed below, for the Class Engines set forth in 40 C.F.R. Parts 90, 1054, 1065, and Title 13 California Code of Regulations ("CCR") §§ 2403(d) and 2433(d).  Among other things, the Class Engines further failed to conform in all material respects to the engine specifications described in the applications for EPA certificates of conformity ("COCs") or CARB executive orders ("EOs") that purportedly cover them.  As a result of these Emissions Violations, the EPA and CARB determined, by selling the uncertified Class Engines nationwide, Kohler violated Section 203(a)(1) of the CAA, 42 U.S.C. § 7522(a)(1) and 13 CCR §§ 2403(b)-(e), 2408, and 2433 (b)-(d).

5.        Plaintiff therefore seeks relief in this action individually, and as a class action on behalf of similarly situated owners of the Class Engines, for breach of express warranty,

_____

[1] Similarly, in California, manufacturers are prohibited from manufacturing for sale, selling, offering for sale, or introducing, delivering, importing into California for introduction into commerce, any SORE or LSI engine unless it is covered by a CARB-issued Executive Order ("EO"). 13 California Code of Regulations ("CCR") §§ 2400(a)(2) and 2430(a)(2).

breach of implied warranty, violation of the Magnusson-Moss Warranty Act, unjust enrichment, negligent misrepresentation, fraud, fraud by omission, and violation of the Wisconsin Deceptive Trade Practice Act.

## JURISDICTION AND VENUE

6.     This Court has subject matter jurisdiction under 28 U.S.C. § 1331 (federal question).  This Court has jurisdiction over supplemental state law claims pursuant to 28 U.S.C. § 1367.

7.     This Court also has jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2).  The matter in controversy, exclusive of interest and costs, exceeds the sum or value of $5,000,000 and is a class action in which there are more than 100 Class members, members of the Classes (as defined below) are citizens of states different from Defendant, and greater than two-thirds of the members of the Classes reside in states other than the states in which Defendant is a citizen.

8.     This Court has personal jurisdiction over Defendant because it is headquartered and incorporated in this district, and purposefully placed the Class Engines into the stream of commerce nationwide from within Wisconsin.

9.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391 because Defendant Kohler Co. is headquartered and is incorporated in this district, regularly transacts substantial business in this district, is subject to personal jurisdiction in this district, and therefore is deemed to be a citizen of this district.  Additionally, Defendant has advertised in this district and have received substantial revenue and profits from the manufacture of the Class Engines in this district; therefore, a substantial part of the events and/or omissions giving rise to the claims occurred, in part, within this district.

## PARTIES

10.     Plaintiff Ben Wankerl is a citizen of Wisconsin and resides in Sauk City, WI. Plaintiff Wankerl owns a MY2013 Exmark Zero Turn Riding Mower, model number LZX940EKC606.  Plaintiff's mower is equipped with a Class Engine supplied by Kohler and has an engine family number of DKHXS.9992PC.  Affixed to Plaintiff's Class Engine is a sticker confirming its compliance with all Applicable Emissions Requirements.  Had he known about the Emissions Violations detailed herein, Plaintiff would not have bought the mower, or would not have done so on the same terms.  On February 27, 2020, Plaintiff sent a letter to Kohler to provide notice of his and Class members' claims and to demand corrective action. *See* Exhibit A.

11.     Defendant Kohler Co. is incorporated under the laws of the State of Wisconsin and has its principal place of business in Kohler, Wisconsin.  Kohler is an American manufacturing company that is best known for plumbing products but also manufactures a variety of other industrial and consumer products including cabinetry, tile, engines and generators as well as owning various hospitality establishments.  Kohler, which was founded in 1873, is privately owned and had $7 billion in revenue in 2018.

12.     At all times relevant to this action, Kohler was engaged in the business of developing, reviewing, approving, designing, manufacturing, supplying, selling, offering for sale, introducing into commerce, delivering for introduction into commerce, or importing (or causing the foregoing with respect to) the Class Engines.  The policies, practices, acts and omissions giving rise to this action and the underlying Emissions Violations were developed in, supervised from, and ultimately emanated from Kohler's headquarters in Wisconsin.  Kohler also made decisions in Wisconsin related to the testing, labeling, advertising, marketing, sales,

4

and/or warranties of the Class Engines.

13.     Kohler is deeply established in Wisconsin.  Since its founding in 1873, Kohler has rooted and grown the company in Wisconsin's heritage and culture.  In fact, the city Kohler's headquarters is located in is named Kohler, after the company.  Kohler's mission is to create a company connected to the surrounding community and its workers' lives.  Kohler themselves built much of the infrastructure, residences, and amenities in Kohler and the surrounding Sheboygan County.  Kohler is the town's largest employer, as well as owns numerous endeavors in the community, including more than one golf course, hotels, and residential real estate.  Kohler, since 1873, has centered its nexus of operations in the same county in Wisconsin, Sheboygan County, and today Kohler's general headquarters and nexus of corporate operations is in Kohler, Wisconsin at 444 Highland Drive Kohler, WI 53044.

14.     Some, if not all, of the Class Engines were manufactured at Kohler's flagship plant in Kohler, Wisconsin.  The 460,000-square-foot facility specializes in producing engines like the Class Engines.[2]  Only within the past four months has Kohler started transiting its engine manufacturing out of Wisconsin.  Despite this move Kohler "remain[s] fully committed to [its] headquarters in Wisconsin, where [it is] continuing to invest in [its] facilities and actively recruiting for a wide range of roles."[3]

## FACTUAL ALLEGATIONS

I.     **The Class Engines And The Applicable Emissions Requirements**

15.     Kohler manufactured the Class Engines in Wisconsin that were then sold or

---

[2] https://www.assemblymag.com/articles/92191-kohler-excels-at-manufacturing-small-gas-engines
[3] https://www.jsonline.com/story/money/business/2019/03/13/kohler-co-end-engine-manufacturing-sheboygan-county/3147374002/

offered for sale nationwide to original equipment manufacturers and distributors and ultimately to end consumers. The Class Engines – also referred to herein as "Small SI Engines" – are small, nonroad, nonhandheld spark-ignition engines and encompass both Kohler's "Small Off-Road Engines" ("the SORE Engines") and Kohler's "Off-Road Large Spark-Ignition Engines" ("the LSI Engines") (collectively, the "Class Engines").[4]

16. All Class Engines include one or more stickers affixed to the engine body by Kohler that certify compliance with the Applicable Emissions Requirements:[5]



---

[4] The SORE Engines produce or are designed to produce less than 25 gross horsepower, whereas the LSI Engines produce or are designed to produce greater than 25 gross horsepower.

[5] The "Applicable Emissions Requirements" for the Class Engines include, *inter alia*, Sections 203, 204, 205, and 213(d) of the Clean Air Act, 42 U.S.C. §§ 7522, 7523, 7524, 7547(d), and regulations promulgated pursuant to Section 213(a) of the Act, 42 U.S.C. § 7547(a), and codified at 40 C.F.R. Parts 1054, 1065, and 1068 as well as California Health and Safety Code Sections 43016, 43017, and 43154, and regulations promulgated pursuant to Sections 39600, 39601, 43013, 43016, 43017, 43101, 43102, and 43104 of the California Health and Safety Code and adopted in 13 CCR § 2400 *et seq.*; 13 CCR § 2407 *et seq.*; 13 CCR § 2408 *et seq.*; 13 CCR § 2430 *et seq.*, as applicable to Small SI Engines regulated under 40 C.F.R. Part 1054 and 13 CCR § 2400 *et seq.* and 13 CCR § 2430 *et seq.*

6



17.     This is the sticker affixed to Plaintiff's Class Engine:

18.     From 2010 to 2016, Kohler applied for and received COCs and EOs purportedly covering millions of Class Engines, including COCs and EOs for each "engine family" listed in Table 1 below.  However, as the EPA and CARB determined, all of these engine families failed to comply with the Applicable Emissions Requirements due to one or more of the Emissions Violations detailed below:[6]

| Table 1 | | | | | |
| --- | --- | --- | --- | --- | --- |
| Kohler Engine Families Not Covered By a Valid COC or EO | | | | | |
| (Families in plain font are carbureted engines; families in *italicized* font are EFI engines; families in ***bold italicized*** font are EFI engines equipped with Delphi ECMs.) | | | | | |
| **MY 2011** | **MY 2012** | **MY 2013** | **MY 2014** | **MY 2015** | **MY 2016** |
| BKHXS.1491GB | CKHXS.1491GB | DKHXS.1491GA | EKHXS.1491GA | FKHXS.1491GA | GKHXS.1491GA |
| BKHXS.1491GD | CKHXS.1731GB | DKHXS.1491GB | EKHXS.1491GB | FKHXS.1491GB | GKHXS.1731GB |
| BKHXS.1731GB | CKHXS.1961GA | DKHXS.1731GB | EKHXS.1731GB | FKHXS.1731GB | GKHXS.1731GC |
| BKHXS.1731GD | CKHXS.2081GA | DKHXS.1961GA | EKHXS.1961GA | FKHXS.1961GA | GKHXS.1961GA |

---

[6] Plaintiff's Class Engine is part of the DKHXS.9992PC engine family.

| | | | | | |
|---|---|---|---|---|---|
| BKHXS.1961GA | CKHXS.2772GA | DKHXS.2081GA | EKHXS.1961GC | FKHXS.1961GC | GKHXS.1961GC |
| BKHXS.2081GA | CKHXS.4262NP | DKHXS.2772GA | EKHXS.2081GA | FKHXS.2081GA | GKHXS.2081GA |
| BKHXS.2081GD | CKHXS.4292GA | DKHXS.4262NP | EKHXS.2772GA | FKHXS.2772GA | GKHXS.2772GA |
| BKHXS.2772GA | CKHXS.5972GB | DKHXS.4292GA | EKHXS.4292GA | FKHXS.4292GA | GKHXS.2772TF |
| BKHXS.4262NP | CKHXS.5972GN | DKHXS.5972GB | EKHXS.5972GB | FKHXS.5972GB | GKHXS.4292GA |
| BKHXS.4292GA | CKHXS.5972GW | DKHXS.5972GN | EKHXS.5972GN | FKHXS.5972GN | *GKHXS.4292PD* |
| BKHXS.5972GB | CKHXS.6242GC | DKHXS.5972GW | EKHXS.5972GW | FKHXS.5972GW | GKHXS.4292TF |
| BKHXS.5972GN | *CKHXS.6742GA* | DKHXS.6242GC | EKHXS.6242GC | FKHXS.5972NB | GKHXS.5972GB |
| BKHXS.5972GW | CKHXS.6742GC | *DKHXS.6742GA* | *EKHXS.6742GA* | FKHXS.6242GC | GKHXS.5972NB |
| BKHXS.6242GA | CKHXS.6742GG | DKHXS.6742GC | EKHXS.6742GC | FKHXS.6742GC | GKHXS.6242GC |
| BKHXS.6242GC | ***CKHXS.6942PC*** | DKHXS.6742GG | EKHXS.6742GG | FKHXS.6742GG | GKHXS.6742GC |
| *BKHXS.6742GA* | CKHXS.7252GB | ***DKHXS.6942PC*** | ***EKHXS.6942PC*** | ***FKHXS.6942PC*** | GKHXS.6742GG |
| BKHXS.6742GC | CKHXS.7252GC | DKHXS.7252GB | EKHXS.7252GB | ***FKHXS.6942PD*** | *GKHXS.6942PD* |
| BKHXS.6742GG | CKHXS.7252GV | DKHXS.7252GC | EKHXS.7252GC | FKHXS.7252GB | GKHXS.7252GC |
| ***BKHXS.6942PC*** | CKHXS.7252LA | DKHXS.7252GV | EKHXS.7252GV | FKHXS.7252GC | GKHXS.7252GV |
| BKHXS.7252GB | CKHXS.7252NA | DKHXS.7252LA | EKHXS.7252LA | FKHXS.7252GV | GKHXS.7252LA |
| BKHXS.7252GC | *CKHXS.7252PC* | DKHXS.7252NA | EKHXS.7252NA | FKHXS.7252LA | GKHXS.7252NA |
| BKHXS.7252GV | CKHXS.7472GC | *DKHXS.7252PC* | *EKHXS.7252PC* | FKHXS.7252NA | GKHXS.7252NB |
| ***BKHXS.7252LA*** | ***CKHXS.7472PC*** | DKHXS.7472GC | EKHXS.7472GC | FKHXS.7252NB | GKHXS.7252ND |
| BKHXS.7252NA | *CKHXS.7472PH* | ***DKHXS.7472PC*** | ***EKHXS.7472PC*** | FKHXS.7252ND | GKHXS.7472GB |
| *BKHXS.7252PC* | CKHXS.9992GC | ***DKHXS.7472NC*** | ***EKHXS.7472NC*** | *FKHXS.7252PC* | GKHXS.7472GC |
| BKHXS.7472GC | CKHXS.9992GD | *DKHXS.7472PH* | *EKHXS.7472PH* | FKHXS.7472GC | GKHXS.7472GD |
| ***BKHXS.7472PC*** | CKHXS.9992NA | DKHXS.9992GC | EKHXS.9992GC | ***FKHXS.7472PC*** | GKHXS.7472GE |
| *BKHXS.7472PH* | | DKHXS.9992GD | EKHXS.9992GD | ***FKHXS.7472PD*** | *GKHXS.7472PC* |
| *BKHXS.7472PM* | | DKHXS.9992NA | EKHXS.9992NA | *FKHXS.7472PM* | *GKHXS.7472PD* |
| BKHXS.9992GC | | ***DKHXS.9992PC*** | ***EKHXS.9992PC*** | ***FKHXS.7472NC*** | *GKHXS.7472PE* |
| BKHXS.9992NA | | | | *FKHXS.7472PH* | ***GKHXS.7472NC*** |

| | | | | | |
|---|---|---|---|---|---|
| | | | | ***FKHXS.8242PD*** | ***GKHXS.7472ND*** |
| | | | | FKHXS.9992GC | *GKHXS.7472PH* |
| | | | | FKHXB.9992DA | *GKHXS.7472PM* |
| | | | | ***FKHXS.9992PC*** | ***GKHXS.8242PD*** |
| | | | | ***FKHXS.9992PD*** | ***GKHXS.8242ND*** |
| | | | | | GKHXS.9992GC |
| | | | | | GKHXB.9992DA |
| | | | | | *GKHXS.9992PD* |

## II. Kohler Admitted – And The EPA And CARB Confirmed – That The Class Engines Do Not Comply With The Applicable Emissions Requirements

19.     In late 2015 and early 2016, Kohler self-disclosed emissions violations to the EPA and CARB.  Between then and January 30, 2020 – when the EPA, CARB, and Kohler publicly filed a consent decree – there was a secret undertaking to investigate, identify, and address the violations, including by commissioning a third-party audit of its internal emissions testing laboratory in 2016.  At no time did Kohler disclose to Plaintiff and Class members the existence of the Emissions Violations, let alone undertake any effort to recall, repair, replace, or otherwise remedy the Class Engines' Emissions Violations.

20.     As determined by the EPA and CARB – and admitted by Kohler – all of the Class Engines failed to comply with one or more of the Applicable Emissions Requirements discussed directly below (collectively, the "Emissions Violations").[7]

21.     First, the EPA and CARB determined that all of the Class Engines failed to

---

[7] For further details on the specificities of the testing regime and certification, the Complaint and Partial Consent Decree in *United States of America, and People of the State of California, ex rel. California Air Resources Board v. Kohler Co.*, Case No. 4:20-cv-00683-KAW (N.D. Cal. 2020) are attached as Exhibit B and Exhibit C, respectively.

comply with 40 C.F.R. Parts 90 ("Part 90"), 1054 ("Part 1054"), 1065 ("Part 1065"), and 13 CCR §§ 2403(d) and 2433(d). As such, the Class Engines do not conform in all material respects to the engine specifications described in the applications for EPA COCs or CARB EOs that purportedly cover them.

22. Second, for Class Engines equipped with electronic fuel injection (the "EFI Class Engines"), Kohler implemented a fueling strategy (the "Defeat Device") that significantly reduced emissions of oxides of nitrogen ("NOx") during certification testing when compared to in-use operation. The EPA and CARB determined that by failing to disclose the Defeat Devices on the EFI Class Engines, Kohler violated Sections 203(a)(1) and 203(a)(3)(B) of the CAA, 42 U.S.C. §§ 7522(a)(1), 7522(a)(3)(B), California Health and Safety Code §§ 43016, 43154, and 13 CCR §§ 2403(d) and 2433(d).

23. Third, Kohler violated Section 203(a)(2) by submitting incomplete production line testing ("PLT") reports and inaccurate averaging, banking, and trading ("ABT") reports to the EPA. In addition, Kohler submitted incomplete or inaccurate PLT reports and inaccurate ABT reports to CARB, and failed to submit required ABT reports to CARB.

24. Finally, Kohler manufactured and offered for sale Class Engines that did not meet the applicable diurnal evaporative emission control requirements, in violation of 13 CCR §§ 2754-2765.

25. At no time did Kohler disclose to Plaintiff and Class members the existence of any of these Emissions Violations, let alone undertake any effort to recall, repair, replace, or otherwise remedy the Class Engines' Emissions Violations.

## III. Kohler Uniformly Warranted That The Class Engines Complied With The Applicable Emissions Requirements

26.    The Class Engines came with Kohler's express warranty that the engine

complied with the Applicable Emissions Requirements:[8]

GENERAL EMISSIONS WARRANTY COVERAGE
**The warranty period begins on the date the engine or equipment is delivered to an ultimate purchaser.** Kohler Co. warrants to the **ultimate purchaser and each subsequent purchaser that the engine is: Designed, built, and equipped so as to conform with all applicable regulations adopted by the Air Resources Board and US EPA**; and free from defects in materials and workmanship that cause the failure of a warranted part to be identical in all material respects to the part as described in the engine manufacturer's application for certification for the [2 year] warranty period stated above.

The warranty on emissions-related parts is as follows:

(1) Any warranted part that is not scheduled for replacement as required maintenance in the owner's manual supplied, is warranted for the warranty period stated above.  If any such part fails during the period of warranty coverage, the part will be repaired or replaced by Kohler Co. at no charge to the owner. Any such part repaired or replaced under the warranty will be warranted for the remaining warranty period.

(2) Any warranted part that is scheduled only for regular inspection in the owner's manual supplied, is warranted for the warranty period stated above. Any such part repaired or replaced under warranty will be warranted for the remaining warranty period.

(3) Any warranted part that is scheduled for replacement as required maintenance in the owner's manual supplied, is warranted for the period of time prior to the first scheduled replacement point for that part. If the part fails prior to the first scheduled replacement, the part will be repaired or replaced by Kohler Co. at no charge to the owner. Any such part repaired or replaced under warranty will be warranted for the remainder of the period prior to the first scheduled replacement point for the part.

(4) Add-on or modified parts that are not exempted by the Air Resources Board may not be used. The use of any non-exempted add-on or modified parts by the ultimate purchaser will be grounds for disallowing a warranty claim. The manufacturer will not be liable to warrant failures of warranted parts caused by the use of a non-exempted add-on or modified part.

---

[8] https://kohlerpower.com/en/engines/warranty (emphasis added).

27.     As a result of the Emissions Violations, Plaintiff and Class members were deprived of the benefit of their bargain in that they did not receive Class Engines that complied with the Applicable Emissions Requirements as warranted.

## IV.     The Class Engines Are Illegal Under Federal Law Because Of The Emissions Violations

28.     Pursuant to Section 213 of the Act, EPA administers a certification program to ensure that Small SI engines introduced into commerce in the United States meet applicable emission standards.  Under this program, EPA issues COCs which represent EPA's pre-approval of the importation or introduction of covered Small SI engines into commerce.  To obtain a COC, a manufacturer must submit a certification application to EPA for each model year ("MY") engine family that it intends to introduce into commerce.  40 C.F.R. §§ 90.107 and 1054.201.  California has a similar process.  Instead of issuing a COC, CARB issues an EO, which represents CARB's pre-approval of the importation or introduction of covered SORE or LSI engines into California.  Cal. Health & Saf. Code §§ 39515 and 39516; 13 CCR §§ 2400(a)(2) and 2430(a)(2).

29.     Engines are covered by a COC or an EO only if they conform in all material respects to the description in the certification application.  40 C.F.R. § 1068.103(c)(1) (incorporated by reference at 40 C.F.R. § 1054.15(c)); 13 CCR § 2405(b)(2) (incorporated by reference at California 1054 Test Procedure, § 1054.205(u)).  Manufacturers are prohibited from selling, offering for sale, introducing into commerce, delivering for introduction into commerce, or importing, any new engine unless that engine is covered by an EPA-issued COC. CAA § 203(a)(1), 42 U.S.C. § 7522(a)(1); 40 C.F.R. § 1068.101(a)(1) (incorporated by reference at 40 C.F.R. § 1054.15(c)).  It is also a violation to cause any of the foregoing acts. CAA § 203(a), 42 U.S.C. § 7522(a).  Similarly, in California, manufacturers are prohibited

from manufacturing for sale, selling, offering for sale, or introducing, delivering, importing into California for introduction into commerce, any SORE or LSI engine unless it is covered by a CARB-issued EO. 13 CCR §§ 2400(a)(2) and 2430(a)(2).

30. As a direct result of the Emissions Violations detailed herein, the Class Engines did not comply with the Applicable Emissions Regulations promulgated by the EPA and CARB, and thus were illegal for sale in the first instance. At no time did Kohler disclose to Plaintiff and Class members the existence of these Emissions Violations, let alone undertake any effort to recall, repair, replace, or otherwise remedy the Class Engines' Emissions Violations.

## TOLLING OF THE STATUTES OF LIMITATION

31. Any applicable statute of limitations has been tolled by Kohler's deceptive conduct alleged herein. Through no fault or lack of diligence, Plaintiff and Class members were deceived regarding the Class Engines' compliance with the EPA and CARB's Applicable Emissions Requirements due to Kohler's active concealment of the Emissions Violations.

32. Plaintiff and Class members could not reasonably discover Kohler's deception with respect to the Class Engines' Emissions Violations prior to the public disclosure by Kohler, the EPA, and CARB on January 30, 2020. Within the time period of any applicable statutes of limitations, Plaintiff and Class members could not have discovered through the exercise of reasonable diligence that Kohler was concealing the Emissions Violations.

33. Plaintiff and Class members did not discover and did not know of any facts that would have caused a reasonable person to suspect that Kohler was concealing a latent defect and/or that the Class Engines failed to comply with the Applicable Emissions Requirements due to the Emissions Violations. As alleged herein, the existence of the Emissions Violations was

material to Plaintiff and Class members at all relevant times.

34.    At all times, Kohler was and is under a continuous duty to disclose to Plaintiff and Class members the true standard, quality, and grade of the Class Engines and to disclose the Emissions Violations associated therewith.

35.    Kohler knowingly, actively and affirmatively concealed the facts alleged herein including the Emissions Violations.  Plaintiff and Class members reasonably relied on Kohler's knowing, active, and affirmative concealment.  Even after self-reporting the Emissions Violations to the EPA and CARB, Kohler made no attempt to inform Plaintiff or Class members of the Emissions Violations or otherwise attempt to repair or replace the Class Engines in order to conform with the Applicable Emissions Requirements.

36.    For these reasons, all applicable statutes of limitation have been tolled based on the discovery rule and Kohler's fraudulent and inequitable concealment and Kohler is estopped from relying on any statutes of limitations in defense of this action.

## CLASS ACTION ALLEGATIONS

37.    Pursuant to Fed. R. Civ. P. 23, Plaintiff seeks to represent a class defined as all persons in the United States who purchased or own a Class Engine (the "Class").  Excluded from the Class are persons who made such purchase for the purpose of resale.

38.    Plaintiff also seeks to represent a subclass of all Class members who purchased or own a Class Engine in Wisconsin (the "Wisconsin Subclass").

39.    Members of the Class and Wisconsin Subclass are so numerous that their individual joinder herein is impracticable.  On information and belief, members of the Class and Wisconsin Subclass number in the hundreds of thousands.  The precise number of Class members and their identities are unknown to Plaintiff at this time but may be determined

through discovery. Class members may be notified of the pendency of this action by mail and/or publication through the distribution records of Defendant and third-party retailers and vendors.

40.     Common questions of law and fact exist as to all Class members and predominate over questions affecting only individual Class members. Common legal and factual questions include, but are not limited to: whether the emissions warranties and related advertising is false or misleading; whether Kohler warranted the emissions ratings and advertising the emissions certifications for the Class Engines; whether Kohler breached these warranties; whether Kohler committed statutory and common law fraud by doing so; and whether Kohler was unjustly enriched by doing so.

41.     The claims of the named Plaintiff are typical of the claims of the Class and Wisconsin Subclass in that the named Plaintiff owns a Class Engine that does not comply with the Applicable Emissions Requirements as a result of Kohler's Emissions Violations.

42.     Plaintiff is an adequate representative of the Class and Wisconsin Subclass because his interests do not conflict with the interests of the Class members he seeks to represent, he has retained competent counsel experienced in prosecuting class actions, and he intends to prosecute this action vigorously. The interests of Class members will be fairly and adequately protected by Plaintiff and his counsel.

43.     The class mechanism is superior to other available means for the fair and efficient adjudication of the claims of the Class and Wisconsin Subclass members. Each individual Class member may lack the resources to undergo the burden and expense of individual prosecution of the complex and extensive litigation necessary to establish Defendant's liability. Individualized litigation increases the delay and expense to all parties and

multiplies the burden on the judicial system presented by the complex legal and factual issues of this case. Individualized litigation also presents a potential for inconsistent or contradictory judgments. In contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court on the issue of Defendant's liability. Class treatment of the liability issues will ensure that all claims and claimants are before this Court for consistent adjudication of the liability issues.

## CLAIMS FOR RELIEF

### COUNT I
### (Breach Of Express Warranty)

44.  Plaintiff hereby incorporates by reference the allegations contained in all preceding paragraphs of this complaint.

45.  Plaintiff brings this claim individually and on behalf of the members of the Class and Wisconsin Subclass against Defendant.

46.  Defendant, as the designer, manufacturer, marketer, distributor, and/or seller, expressly warranted that the Class Engines met the Applicable Emissions Requirements at the time of sale.

47.  In fact, the Class Engines do not comply with the Applicable Emissions Requirements due to the Emissions Violations and thus are not as marketed, advertised, and/or warranted.

48.  As a result of the Emissions Violations, the Class Engines were defective and did not adhere to the express warranty when first sold and have not been repaired, replaced, or otherwise remedied as originally warranted since the time of sale.

49.  By breaching its express warranty, Kohler has caused and continues to cause

16

these warranties to fail of their essential purpose.

50. The time limits contained in Defendant's warranty period are also unconscionable and inadequate to protect Plaintiff and the Class members. Among other things, Plaintiff and Class members had no meaningful choice in determining these time limitations, the terms of which unreasonably favored Defendant. A gross disparity in bargaining power existed between Defendant and the Class members, and Defendant knew or should have known the Emissions Violations imputed every Class Engine at the time of sale.

51. As a direct and proximate cause of Defendant's breach of express warranty, Plaintiff and members of the Classes have been injured and harmed because: (a) they would not have purchased the Class Engines on the same terms if they knew that the truth about the Emissions Violations; (b) they paid a price premium for the Class Engines due to the Emissions Claims which were false; (c) the Class Engines do not have the characteristics, uses, benefits, or quantities as promised because of the Emissions Violations; and (d) the Class Engines do not conform to the Applicable Emissions Requirements because of the Emissions Violations.

52. Plaintiff, individually and on behalf of the Class and Subclasses, seeks all damages permitted by law, including compensation for the monetary difference between the Class Engines as warranted and as sold; compensation for the reduction in resale value; compensation for out-of-pocket repairs and service; the cost of purchasing, leasing, and/or renting replacement engines; along with all other incidental and consequential damages, statutory damages, attorney's fees, and all other relief allowed by law.

## COUNT II
### (Breach Of The Implied Warranty Of Merchantability)

53.     Plaintiff hereby incorporates by reference the allegations contained in all preceding paragraphs of this complaint.

54.     Plaintiff brings this claim individually and on behalf of the members of the Class and Wisconsin Subclass against Defendant.

55.     Defendant, as the designer, manufacturer, marketer, distributor, and/or seller, affixed the Emissions Claims to each Class Engine and impliedly warranted that the Class Engines complied with the EPA and CARB's Applicable Emissions Requirements when in fact they did not.

56.     Defendant breached the warranty implied in the contract for the sale of the Class Engines because they could not pass without objection in the trade under the contract description, the goods were not of fair average quality within the description, and the goods were unfit for their intended and ordinary purpose because the Class Engines do not comply with the EPA and CARB's Applicable Emissions Requirements due to the Emissions Violations. As a result, Plaintiff and members of the Classes did not receive the Class Engines as impliedly warranted by Defendant to be merchantable.

57.     Plaintiff and members of the Classes purchased the Class Engines in reliance upon Defendant's skill and judgment and the implied warranties of fitness for the purpose.

58.     The Class Engines were not altered by Plaintiff and members of the Classes.

59.     The Class Engines were defective when they left the exclusive control of Defendant.

60.     Defendant knew that the Class Engines would be purchased and used without additional testing by Plaintiff and Class members.

18

61.     As a result of the Emissions Violations, the Class Engines were defectively designed and unfit for their intended purpose, and Plaintiff and Class members did not receive the goods as warranted.

62.     As a direct and proximate cause of Defendant's breach of the implied warranties Plaintiff and members of the Classes have been injured and harmed because:  (a) they would not have purchased the Class Engines on the same terms if they knew that the truth about the Emissions Violations; (b) they paid a price premium for the Class Engines due to the Emissions Claims which were false; (c) the Class Engines do not have the characteristics, uses, benefits, or quantities as promised because of the Emissions Violations; and (d) the Class Engines do not conform to the Applicable Emissions Regulations because of the Emissions Violations.

## COUNT III
### (Violation Of The Magnusson-Moss Warranty Act ("MMWA"), 15 U.S.C. §§ 2301, *et seq.*)

63.     Plaintiff hereby incorporates by reference the allegations contained in all preceding paragraphs of this complaint.

64.     Plaintiff brings this claim individually and on behalf of the members of the proposed Class and the Wisconsin Subclass against Defendant.

65.     The Class Engines are consumer products as defined in 15 U.S.C. § 2301(1).

66.     Plaintiff and Class members are consumers as defined in 15 U.S.C. § 2301(3).

67.     Defendant is a supplier and warrantor as defined in 15 U.S.C. § 2301(4) and (5).

68.     The amount in controversy of the Plaintiff's individual claim meets or exceeds $25.00 in value.  In addition, the amount in controversy meets or exceeds $50,000 in value

19

(exclusive of interest and costs) computed on the basis of all claims to be determined in this suit.

69.     In connection with the sale of the Class Engines, Defendant issued written warranties as defined in 15 U.S.C. § 2301(6), which warranted that the Class Engines met the Applicable Emissions Requirements set forth by the EPA and CARB.

70.     Kohler violated the MMWA when it failed to honor its written warranty obligations in its express emissions warranty by delivering Class Engines that suffered from the Emissions Violations and thus failed to meet the Applicable Emissions Requirements as described in detail above.

71.     The terms of Kohler's express emissions warranty became part of the basis of the bargain between Plaintiff and all other Class Members when deciding to purchase a Class Engine.

72.     Kohler breached its written warranty with respect to the Class Engines: (1) each time it sold Class Engines with Emissions Violations; (2) each time it failed to properly recall, repair, replace, adjust, or otherwise remedy the Class Engines' Emissions; and (3) each time it failed to otherwise disclose the Class Engines' Emissions Violations.

73.     Kohler breached the implied warranty of merchantability when it sold Class Engines to consumers that suffered from the Emissions Violations when they left Kohler's control.  Plaintiff and Class members used their Class Engines for the ordinary purpose of being an emissions compliant engine.  Despite Plaintiff's and Class members' ordinary and expected use of their engines, the Class Engines were non-compliant when originally sold due to the Emissions Violations.  As a result, Kohler breached the implied warranty of merchantability when it sold Class Engines that were not of fair average quality and would not pass without

objection in that they failed to comply the Applicable Emissions Requirements.

74.    Kohler has been given a reasonable opportunity to cure its breach of the express emissions warranty and implied warranty of merchantability and/or Plaintiff and Class members were not required to do so because such an opportunity would be futile. Kohler has known about the Emissions Violations since at least 2015 and has failed to repair or replace the Class Engines as originally warranted or otherwise provide notice of the Emissions Violations to Plaintiff and Class members.

75.    As a direct and proximate result of Kohler's breach of the express emissions warranty and the implied warranty of merchantability, Plaintiff and Class members have suffered damages in an amount to be determined at trial.

76.    Plaintiff and Class members were injured as a direct and proximate result of Defendant's breach because: (a) they would not have purchased the Class Engine on the same terms if the true facts were known about the Emissions Violations; (b) they paid a price premium for the Class Engines as a result of the Emissions Claims; (c) the Class Engines did not have the characteristics as promised because of the Emissions Violations; and (d) the Class Engines do not conform to the Applicable Emissions Regulations because of the Emissions Violations.

## COUNT IV
### (Unjust Enrichment)

77.    Plaintiff hereby incorporates by reference the allegations contained in all preceding paragraphs of this complaint.

78.    Plaintiff brings this claim individually and on behalf of the members of the Class and Wisconsin Subclass against Defendant.

79.    To the extent the Court determines it is necessary to do so, this claim is pled in

the alternative to the other legal claims alleged in the complaint.

80.    Plaintiff and members of the Classes conferred benefits on Defendant by purchasing the Class Engines.  Defendant was and should have been reasonably expected to provide Class Engines free from the any Emissions Violations.

81.    Defendant has been unjustly enriched in retaining the revenues derived from Plaintiff and Class members' purchases of the Class Engines.  Retention of those moneys under these circumstances is unjust and inequitable because Defendant misrepresented and concealed that the Class Engines failed to meet the EPA and CARB's Applicable Emissions Requirements due to the Emissions Violations.  These misrepresentations caused injuries to Plaintiff and Class members because they would not have purchased the Class Engines at all, or on the same terms, if the true facts about the Emissions Violations were known.

82.    Defendant unjustly profited from the lease and sale of the Class Engines at inflated prices as a result of its false representations, omissions and concealment of the Emissions Violations.  Defendant benefited, at Plaintiff's and Class members' expense, when it sold the Class Engines that were inferior to the emissions-compliant engines that Plaintiff and Class members thought they were purchasing, yet the price they paid was the price for an engine free from any Emissions Violations.  Defendant also unjustly profited from refusing to repair or replace the Class Engines in order for them to comply with the EPA and CARB's Applicable Emissions Requirements.

83.    As a proximate result of Defendant's false representations, omissions and/or concealment of the Emissions Violations in the Class Engines, and as a result of Defendant's ill-gotten gains, benefits and profits, Defendant has been unjustly enriched at the expense of Plaintiff and members of the Classes.  It would be inequitable for Defendant to retain its ill-

gotten profits without paying the value thereof to Plaintiff and members of the Classes.

84.     There is a direct relationship between Defendant on the one hand, and Plaintiff and Class members on the other, sufficient to support a claim for unjust enrichment. Defendant failed to disclose the Emissions Violations to improve retail sales, which in turn improved wholesale sales. Conversely, Defendant knew that disclosure of the Emissions Violations would suppress retail and wholesale sales of the Class Engines, suppressing the demand for the Class Engines, and would negatively impact the reputation of Defendant's brand among Class members and consumers. Defendant also knew its concealment and suppression of the Emissions Violation would discourage Plaintiff and Class members from seeking replacement or repair of the Class Engines, thereby increasing profits and/or avoiding the cost of such replacement or repairs.

85.     Plaintiff and members of the Classes are entitled to restitution in the amount of Defendant's ill-gotten gains, benefits and profits, including interest, resulting from their unlawful, unjust and inequitable conduct. Plaintiff and members of the Classes therefore seek an order requiring Defendant to disgorge its gains and profits to Plaintiff and members of the Classes, together with interest, in a manner to be determined by the Court.

## COUNT V
### (Negligent Misrepresentation)

86.     Plaintiff hereby incorporates by reference the allegations contained in all preceding paragraphs of this complaint.

87.     Plaintiff brings this claim individually and on behalf of the members of the Class and Wisconsin Subclass against Defendant.

88.     As discussed above, Defendant misrepresented that the Class Engines met the EPA and CARB's Applicable Emissions Requirements notwithstanding the Emissions

23

Violations.  Defendant had a duty to disclose the true emissions testing and certification information rather than the doctored information ultimately obtained as a result of the Emissions Violations.  Despite this duty, at no time did the Defendant disclose to Plaintiff and Class members the existence of the Emissions Violations, let alone undertake any effort to recall, repair, replace, or otherwise remedy the Emissions Violations.

89.     At the time Defendant made these representations, Defendant knew or should have known that these representations were false or made them without knowledge of their truth or veracity.  At an absolute minimum, Defendant negligently misrepresented and/or negligently omitted material facts about the Class Engines, namely the Emissions Violations.

90.     The negligent misrepresentations and omissions made by Defendant, upon which Plaintiff and Class members reasonably and justifiably relied, were intended to induce and actually induced Plaintiff and Class members to purchase the Class Engines.

91.     Plaintiff and Class members would not have purchased the Class Engines if the true facts about the Emissions Violations had been known.

92.     The negligent actions of Defendant caused damage to Plaintiff and Class members, who are entitled to damages and other legal and equitable relief as a result.

## COUNT VI
### (Fraud)

93.     Plaintiff hereby incorporates by reference the allegations contained in all preceding paragraphs of this complaint.

94.     Plaintiff brings this claim individually and on behalf of the members of the Class and Wisconsin Subclass against Defendant.

95.     As discussed above, Defendant provided Plaintiff and Class members with false and/or misleading material information and failed to disclose material facts about the Class

24

Engines, including but not limited to the fact that they do not meet the EPA and CARB's Applicable Emissions Requirements as result of the Emissions Violations. These misrepresentations and omissions were made with knowledge of their falsehood.

96.     The misrepresentations and omissions made by Defendant, upon which Plaintiff and Class members reasonably and justifiably relied, were intended to induce and actually induced Plaintiff and Class members to purchase the Class Engines.

97.     The fraudulent actions of Defendant caused damage to Plaintiff and Class members, who are entitled to damages and other legal and equitable relief as a result.

## COUNT VII
### (Fraud By Omission)

98.     Plaintiff incorporates by reference all allegations contained in this Complaint as though fully set forth herein.

99.     Plaintiff brings this count on behalf of himself and members of the Class and Wisconsin Subclass.

100.    Defendant intentionally and knowingly concealed, suppressed and/or omitted material facts including the standard, quality or grade of the Class Engines and the fact that they suffered from one or more Emissions Violations with the intent that Plaintiff and Class members rely thereon. As a direct result of Defendant's fraudulent conduct, Plaintiff and Class members have suffered actual damages.

101.    The names of individuals employed by Defendant who knew or should have known about the Emissions Violations are in the exclusive possession of Defendant.

102.    The decision to conceal the Emissions Violations from consumers was made before the Class Engines were released.

103.    The Emissions Violations affect all Class Engines. Defendant did not fully and

truthfully disclose to Plaintiff and other class members the true nature of the Class Engines in that it failed to disclose the Emissions Violations at the time of sale and thereafter.

104.     Plaintiff and Class members would not have purchased the Class Engines but for Defendant's omissions and concealment of material facts regarding the nature and quality of the Class Engines and their compliance with the Applicable Emissions Requirements.

105.     Defendant had a duty to disclose the Emissions Violations because it renders the Class Engines illegal for sale.  Defendant also had a duty to disclose the Emissions Violations as a result of partial representations made in the emissions warranty.

106.     Defendant knew its concealment and suppression of material facts were false and misleading and knew the effect of concealing those material facts.  Defendant knew its concealment and suppression of the Emissions Violation would sell more Class Engines and would discourage Plaintiff and Class members from seeking replacement or repair of the engines, thereby increasing profits.

107.     Defendant acted with malice, oppression and fraud.

108.     Plaintiff and Class members reasonably relied upon Defendant's knowing, affirmative and active concealment and omissions.  As a direct and proximate result of Defendant's omissions and active concealment of material facts regarding the Emissions Violations, Plaintiff and Class members suffered actual damages in an amount to be determined at trial.

**COUNT VIII**
**(Wisconsin Deceptive Trade Practice Act ("DTPA"))**

109.     Plaintiff hereby incorporates by reference the allegations contained in all preceding paragraphs of this complaint.

110.     Plaintiff brings this claim individually and on behalf of the members of the

Class and Wisconsin Subclass against Defendant.

111.    The Wisconsin DTPA prohibits a "representation or statement of fact which is untrue, deceptive or misleading." Wis. Stat. § 100.18(1).

112.    Kohler is a "person, firm, corporation or association" within the meaning of Wis. Stat. § 100.18(1).

113.    Plaintiff and Class members of the Wisconsin Subclass members are members of "the public" within the meaning of Wis. Stat. § 100.18(1).

114.    Section 100.18(1), in relevant part, provides that "no person, firm, corporation, or association, or agent or employee thereof, with intent to sell, distribute, or increase the consumption of … anything offered" by it to the public, shall place before the public a statement that contains "assertion, representation or statement of fact which is untrue, deceptive or misleading."

115.    Defendant misrepresented the quality of the Class Engines and their compliance with the EPA and CARB's Applicable Emissions Requirements as a result of the Emissions Violations.

116.    Defendant intended that Plaintiff and Class members rely on its misrepresentations.

117.    As a proximate result of Defendant's misrepresentations and omissions, Plaintiff and Class members suffered direct economic loss (pecuniary), suffered an injury-in-fact and/or actual damages by paying a price premium for the Class Engines based on the understanding that they complied with the EPA and CARB's Applicable Emissions Requirements. Had Plaintiff and other Class members known about the Emissions Violations, they would not have bought the Class Engines, or they would not have purchased them on the

same terms.

118.    In the course of its business, Kohler concealed the Emissions Violations in the Class Engines as described herein and otherwise engaged in activities with a tendency or capacity to deceive.  Kohler also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Class Engines.

119.    Kohler's concealment of the Emissions Violations for the Class Engines was material to Plaintiff and Class members.

120.    Plaintiff and Class members suffered ascertainable loss caused by Kohler's misrepresentations and its failure to disclose material information related to the Emissions Violations.  Had they been aware of the Emissions Violations in the Class Engines, Plaintiff and Class members either would have paid less for their Class Engines or would not have purchased them at all.  Plaintiff and Class members did not receive the benefit of their bargain as a result of Kohler's concealment of the Emissions Violations.

121.    Kohler's violations are a disservice to Plaintiff as well as to the general public. Kohler's unlawful acts and practices complained of herein affected the public interest.

122.    Plaintiff and Class members are entitled to damages, attorneys' fees, and other relief that the Court deems proper.  Because Kohler's conduct was committed knowingly and/or intentionally, Plaintiff and the Class members are also entitled to treble and/or punitive damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, seeks judgment against Defendant, as follows:

a. For an order certifying the Class and the Wisconsin Subclass under Rule 23 of the Federal Rules of Civil Procedure and naming Plaintiff as a representative of the Class and Wisconsin Subclass and Plaintiff's attorneys as Class Counsel to represent the Class and Wisconsin Subclass members;

b. For an order declaring Defendant's conduct violates the statutes referenced herein;

c. For an order finding in favor of Plaintiff, the Class, and the Wisconsin Subclass on all counts asserted herein;

d. For compensatory, statutory, treble, and/or punitive damages in amounts to be determined by the Court and/or jury;

e. For prejudgment interest on all amounts awarded;

f. For an order of restitution and all other forms of equitable monetary relief;

g. For injunctive relief as pleaded or as the Court may deem proper; and

h. For an order awarding Plaintiff, the Class, and the Wisconsin Subclass their reasonable attorneys' fees, expenses, and costs of suit.

## DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury of any and all issues in this action so triable of right.

Dated: March 6, 2020                   Respectfully submitted,

                                       **BURSOR & FISHER, P.A.**

                                       By:_____*/s/ Frederick J. Klorczyk III*_____
                                             Frederick J. Klorczyk III
                                       Frederick J. Klorczyk III
                                       1990 North California Blvd., Suite 940
                                       Walnut Creek, CA 94596
                                       Telephone: (925) 300-4455
                                       Facsimile: (925) 407-2700
                                       Email: fklorczyk@bursor.com

29

Joseph I. Marchese
888 Seventh Avenue
New York, NY 10019
Telephone: (646) 837-7410
Facsimile: (212) 989-9163
E-Mail: jmarchese@bursor.com

**O'NEIL, CANNON, HOLLMAN, DEJONG &
LAING S.C.**
Douglas P. Dehler
Laura J. Lavey
111 E. Wisconsin Avenue, Suite 1400
Milwaukee, WI 53202
Telephone: (414) 276-5000
Facsimile: (414) 276-6581
E-Mail: doug.dehler@wilaw.com
        laura.lavey@wilaw.com

*Attorneys for Plaintiff*

**EXHIBIT A**

# BURSOR & FISHER
### P.A.

1990 N. CALIFORNIA BLVD., SUITE 940
WALNUT CREEK, CA 94596
www.bursor.com

FREDERICK J. KLORCZYK III
Tel: 925.300.4455
Fax: 925.407.2700
fklorczyk@bursor.com

February 27, 2020

***Via Certified Mail - Return Receipt Requested & FedEx Overnight***

Kohler Co.
Attn: Legal Department
444 Highland Drive
Kohler, WI 53044

Re:     *Notice and Demand Letter Pursuant to U.C.C. §§ 2-313, 2-314, 2-607; the Magnuson-*
        *Moss Warranty Act, 15 U.S.C. §§ 2301, et seq; the Wisconsin Deceptive Trade Practices*
        *Act, WIS. STAT. § 100.18, et seq.; and all other applicable consumer protection statutes*

To Whom it May Concern:

        This letter serves as a preliminary notice and demand for corrective action by Kohler Co.
("Kohler," "You," "Defendant"), pursuant to U.C.C. § 2-607(3)(a) concerning breaches of
express and implied warranties on behalf of our client Ben Wankerl, and a class of all similarly
situated purchasers of Kohler's MYs 2011-2016 Small SI engines (collectively the "Class
Engines").[1]  This letter also serves as notice of violation of the Magnuson-Moss Warranty Act,
15 U.S.C. §§ 2301, *et seq.*; the Wisconsin Deceptive Trade Practices Act, WIS. STAT. § 100.18,
*et seq.*, and all other applicable federal and state laws.

        You have participated in the design, manufacture, marketing and sale of Kohler's MYs
2011-2016 Small SI Engines.  The Class Engines are marketed as compliant with state and
federal emission standards.  However, you fail to disclose that the Class Engines are non-
compliant with state and federal emission standards.

        Our client, Ben Wankerl, owns a lawn mower with a Kohler DKHXS.9992PC engine that
was warranted to comply with state and federal emission requirements.  Mr. Wankerl is acting on
behalf of himself as well as a class defined as all persons in the United States who leased or
purchased a Class Engine in the United States.  Mr. Wankerl is also acting on behalf of a
subclass of persons who leased or purchased a Class Engine in the state of Wisconsin.

        On behalf of our client and the Class, we hereby demand that Kohler immediately (1)
issue a mandatory recall of the Class Engines, (2) repair or replace the Class Engines such that
they comply with applicable state & federal emission requirements, and (3) make full restitution
to all purchasers of the Class Engines of all money obtained from sales thereof.

---

[1] The Class Engines include all engines identified in *U.S. v. Kohler Co.*, 3:20-cv-00683-KAW (N.D. Cal.), Dkt. 1 ¶
65, Table 1.

We also demand that Kohler preserve all documents and other evidence – including electronically stored information – which refer or relate to any of the above-described practices since 2010, including electronically stored information and including, but not limited to, the following:

1. All documents provided to the Environmental Protection Agency ("EPA"), the California Air Resources Board ("CARB"), and any other federal or state governmental agency related to the Class Engines;

2. All documents concerning the advertisement, marketing, and/or sale of the Class Engines;

3. All documents concerning communications with purchasers of the Class Engines, including but not limited to customer complaints or service bulletins;

4. All documents concerning the total number of Class Engines manufactured and the total revenue you derived from sales thereof;

5. All documents concerning the design, development, and/or testing of the Class Engines, including their emissions systems;

6. All documents concerning the sale of the Class Engines by manufacturers for use in their power equipment products; and

7. All documents concerning your discovery that the Class Engines did not comply with state and federal emission requirements.

If you contend that any statement in this letter is inaccurate in any respect, please provide us with your contentions and supporting documents immediately upon receipt of this letter.

Please contact me right away if you wish to discuss an appropriate way to remedy this matter. If I do not hear from you promptly, I will take that as an indication that you are not interested in doing so.

Very truly yours,

Frederick J. Klorczyk III

**EXHIBIT B**

JEFFREY BOSSERT CLARK
Assistant Attorney General
Environment and Natural Resources Division
U.S. Department of Justice
PATRICIA L. HURST (DCBN 438882)
Senior Counsel, Environmental Enforcement Section
150 M Street N.E.
Washington, D.C. 20002
Telephone: (202) 307-1242
Facsimile: (202) 514-0097
Email: Patricia.Hurst@usdoj.gov

DAVID L. ANDERSON (CABN 149604)
United States Attorney
SARA WINSLOW (DCBN 457643)
Chief, Civil Division
MICHELLE LO (NYBN 4325163)
Assistant United States Attorney
450 Golden Gate Avenue, Box 36055
San Francisco, California 94102-3495
Telephone: (415) 436-7180
Facsimile: (415) 436-6748
Email:  Michelle.Lo@usdoj.gov

*[Refer to signature pages for complete list of parties represented]*

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

UNITED STATES OF AMERICA, and
PEOPLE OF THE STATE OF CALIFORNIA, *ex rel.*
CALIFORNIA AIR RESOURCES BOARD,

      *Plaintiffs*,

  v.

KOHLER CO.,

      *Defendant.*

**COMPLAINT**

1

The United States of America, by authority of the Attorney General of the United States and at the request of the Administrator of the United States Environmental Protection Agency ("EPA"), and the People of the State of California, *ex rel.* California Air Resources Board ("CARB"), through the California Office of the Attorney General, allege as follows:

## NATURE OF ACTION

1.      This is a civil action against Kohler Co. ("Kohler") brought pursuant to Sections 203, 204, 205, and 213(d) of the Clean Air Act (the "CAA" or "Act"), 42 U.S.C. §§ 7522, 7523, 7524, 7547(d), and regulations promulgated pursuant to Section 213(a) of the Act, 42 U.S.C. § 7547(a), and codified at 40 C.F.R. Parts 90 (Control of Emissions from Nonroad Spark-Ignition Engines At or Below 19 Kilowatts), 1054 (Control of Emissions from New, Small Nonroad Spark-Ignition Engines and Equipment), 1065 (Engine-Testing Procedures), and 1068 (General Compliance Provisions for Highway, Stationary, and Nonroad Programs).

2.      This civil action is also brought pursuant to California Health and Safety Code Sections 43016, 43017, and 43154, and regulations promulgated pursuant to Sections 39600, 39601, 43013, 43016, 43017, 43101, 43102, and 43104 of the California Health and Safety Code and adopted in Title 13 California Code of Regulations ("CCR") § 2400 *et seq.* (Small Off-Road Engines or "SORE"); 13 CCR § 2407 *et seq.* (New Engine Compliance and Production Line Testing – New Small Off-Road Engine Selection, Evaluation, and Enforcement Action); 13 CCR § 2408 *et seq.* (Emission Reduction Credits); 13 CCR § 2430 *et seq.* (Large Spark-Ignition Engines or "LSI"). These regulations incorporate the following test procedures: California Exhaust Emission Standards and Test Procedures for 2005-2012 Small Off-Road Engines (adopted July 26, 2004 and amended October 25, 2012) (hereinafter, "2005-2012 California Test Procedures"); California Exhaust Emission Standards and Test Procedures for New 2013 and Later Small Off-Road Engines; Engine Testing Procedures (Part 1054) (adopted October 25, 2012) (hereinafter, "California 1054 Test Procedures"); and California Exhaust Emission Standards and Test Procedures for New 2013 and Later Small Off-Road Engines; Engine-Testing Procedures (Part 1065) (adopted October 25, 2012) (hereinafter, "California 1065 Test Procedures") (collectively, "California Test Procedures"). The California Test Procedures

2

incorporate certain provisions of 40 C.F.R. Parts 1054 and 1065 by reference with some additions and deletions.

3.      This action involves Kohler's manufacture and sale of nonroad, nonhandheld spark-ignition engines nationwide, including in California (which include both SORE engines and LSI engines with displacement equal to or less than 1.0 liter (hereinafter, "LSI engines") under California's regulations) (collectively, "Small SI engines") that failed to comply with the applicable certification requirements set forth in 40 C.F.R. Parts 90 ("Part 90"), 1054 ("Part 1054"), 1065 ("Part 1065"), and 13 CCR §§ 2403(d) and 2433(d), which incorporate the California Test Procedures. These Small SI engines do not conform in all material respects to the engine specifications described in the applications for the certificates of conformity ("COCs") or CARB executive orders ("EOs") that purportedly cover them. Kohler therefore violated Section 203(a)(1) of the CAA, 42 U.S.C. § 7522(a)(1) and 13 CCR §§ 2403(b)-(e), 2408, and 2433 (b)-(d), by selling uncertified Small SI engines nationwide, including in California. The United States and CARB seek civil penalties and injunctive relief for these violations.

4.      Kohler also developed and installed a calibration on its electronic fuel-injected ("EFI") Small SI engines equipped with Delphi electronic control modules ("ECMs") that contained a fueling strategy that significantly reduced emissions of oxides of nitrogen ("NOx") during certification testing when compared to in-use operation. Kohler violated Sections 203(a)(1) and 203(a)(3)(B) of the CAA, 42 U.S.C. §§ 7522(a)(1), 7522(a)(3)(B), California Health and Safety Code §§ 43016, 43154, and 13 CCR §§ 2403(d) and 2433(d), by failing to disclose the fueling strategy equipped on these engines, and by manufacturing, selling, and installing defeat devices on Small SI engines nationwide, including in California. The United States and CARB seek civil penalties and injunctive relief for these violations.

5.      Also, each certification application is a "report" within the meaning of Section 208(a) of the CAA, and 13 CCR §§ 2403(d) and 2433(d). Consequently, Kohler's failure to disclose AECDs and adjustable parameters in EPA and CARB certification applications constituted violations of Section 203(a)(2) of the CAA, 42 U.S.C. § 7522(a)(2), and 13 CCR §§ 2403(d) and 2433(d) (incorporating the requirements of California 1054 Test Procedures, §§

3

1054.115(b), 1054.201, and 1054.205(b) and (q)), which prohibit any person from providing false or incomplete information in reports to EPA or CARB. Kohler also violated Section 203(a)(2) by submitting incomplete production line testing ("PLT") reports and inaccurate averaging, banking, and trading ("ABT") reports to EPA. In addition, Kohler submitted incomplete or inaccurate PLT reports and inaccurate ABT reports to CARB, and failed to submit required ABT reports to CARB, in violation of 13 CCR §§ 2403, 2407(c)(4)(E), 2408(i), and 2433. The United States and CARB seek civil penalties and injunctive relief for these violations.

6.   Finally, Kohler manufactured and offered for sale in California SORE engines that did not conform in all material respects to the engine specifications described in the applications for the EO that purportedly covered them because the engines did not meet the applicable diurnal evaporative emission control requirements, in violation of 13 CCR §§ 2754-2765.

### JURISDICTION, VENUE, AND INTRADISTRICT ASSIGNMENT

7.   This Court has jurisdiction over the subject matter of this action pursuant to Section 205(b) of the Act, 42 U.S.C. § 7524(b), 28 U.S.C. §§ 1331 (Federal Question), 1345 (United States as Plaintiff), and 1355 (Fine, Penalty, or Forfeiture), and Section 304 of the Act, 42 U.S.C. § 7604 (Citizen Suits). Pursuant to Section 304 of the Act, CARB served its notice of violation and intent to sue on November 13, 2019. This Court also has supplemental jurisdiction over the state law claims because they are part of the same case or controversy as the claims over which the Court has jurisdiction. 28 U.S.C. § 1367.

8.   Venue is proper in this District pursuant to Section 205(b) of the Act, 42 U.S.C. § 7524(b), and 28 U.S.C. §§ 1391(b) and 1395(a), because a substantial part of the acts for which Plaintiffs seek civil penalties occurred in this District.

9.   Intradistrict Assignment: EPA Region 9 is headquartered in San Francisco. Civil Local Rule 3-2(d) for the Northern District of California provides for assignment to the San Francisco Division or the Oakland Division.

4

## PARTIES

10.     Plaintiff United States of America has authority to bring this action on behalf of the EPA Administrator under Section 305 of the Act, 42 U.S.C. § 7605, and 28 U.S.C. §§ 516 and 519.

11.     This action is also brought by the People of the State of California, *ex rel.* CARB.

12.     Plaintiff CARB is a public agency of the State of California within the California Environmental Protection Agency. The mission of CARB is to promote and protect public health, welfare, and ecological resources of California's citizens through the monitoring and protection of air quality. CARB's major goals include providing safe, clean air to all Californians, reducing California's emission of air pollution, and providing leadership and innovative approaches for implementing air pollution controls. CARB is the agency responsible for ensuring California's compliance with the regulations at issue here.

13.     Defendant Kohler is an American company incorporated under the laws of the State of Wisconsin with its principal place of business in Kohler, Wisconsin.

14.     Kohler is a "manufacturer" within the meaning of Section 216(1) of the Act, 42 U.S.C. § 7550(1), and in California a "large volume manufacturer" within the meaning of 13 CCR § 1900(b) and "engine manufacturer" within the meaning of 13 CCR § 2433(b)(16).

15.     Kohler is a "person" within the meaning of Section 302(e) of the Act, 42 U.S.C. §7602(e), and in California, Health and Safety Code § 39047.

16.     At all times relevant to this action, Kohler was engaged in the business of manufacturing, selling, offering for sale, introducing into commerce, delivering for introduction into commerce, or importing (or causing the foregoing with respect to) Small SI engines in the United States within the meaning of the CAA and in California within the meaning of 13 CCR §§ 2401(a) and 2430(a)(2).

## STATUTORY AND REGULATORY BACKGROUND

17.     This case arises under Part A of Section II of the Act, 42 U.S.C. § 7521 *et seq.*, and the regulations promulgated thereunder, and Division 26, Part 5 of California's Health and Safety Code, and the regulations promulgated thereunder, which aim to protect public health and

5

the environment by reducing emissions of NOx, hydrocarbons ("HC"), and other pollutants from mobile sources of air pollution, including Small SI engines.

18.    NOx contributes to the formation of ozone (colloquially referred to as smog) and fine particulate matter ("soot"), exposure to which is linked to a number of respiratory- and cardiovascular-related health effects as well as premature death. Children, seniors, people who are active outdoors (including outdoor workers), and people with pre-existing cardiovascular and respiratory conditions are particularly at risk for adverse health effects related to smog and soot exposure. Nitrogen dioxide formed by NOx emissions can aggravate respiratory diseases, particularly asthma, and may also contribute to asthma development in children.

19.    The Act requires EPA to prescribe and revise, by regulation, standards applicable to the emission of any air pollutant from new motor vehicles or new motor vehicle engines which cause or contribute to air pollution which may reasonably be anticipated to endanger public health or welfare. 42 U.S.C. § 7521(a)(1). Section 213(a)(3) of the Act requires EPA to promulgate standards for nonroad equipment that will achieve the greatest degree of emission reduction available, and requires that EPA consider standards equivalent in stringency to those applicable to motor vehicles. 42 U.S.C. § 7547(a)(3). Further, Section 213(d) states that nonroad vehicle and engine standards, "shall be enforced in the same manner as standards prescribed under Section 202 [of the Act, 42 U.S.C. § 7521,]" for motor vehicles and motor vehicle engines, and that the Administrator "shall revise or promulgate regulations as may be necessary to determine compliance with, and enforce, standards in effect under [Section 213 of the Act]." 42 U.S.C. § 7547(d).

20.    In California, the Health and Safety Code requires CARB to adopt and implement motor vehicle emission standards for the control of air contaminants and sources of air pollution, including off-road and nonvehicle engine categories. Cal. Health & Saf. Code § 43101. California first adopted regulations for SORE engines in 1992 and LSI engines in 1999.

21.    Pursuant to Section 213 of the Act, EPA administers a certification program to ensure that Small SI engines introduced into commerce in the United States meet applicable emission standards. Under this program, EPA issues COCs which represent EPA's pre-approval

6

of the importation or introduction of covered Small SI engines into commerce. To obtain a COC, a manufacturer must submit a certification application to EPA for each model year ("MY") engine family that it intends to introduce into commerce. 40 C.F.R. §§ 90.107 and 1054.201. California has a similar process. Instead of issuing a COC, CARB issues an EO, which represents CARB's pre-approval of the importation or introduction of covered SORE or LSI engines into California. Cal. Health & Saf. Code §§ 39515 and 39516; 13 CCR §§ 2400(a)(2) and 2430(a)(2).

22.     Engines are covered by a COC or an EO only if they conform in all material respects to the description in the certification application. 40 C.F.R. § 1068.103(c)(1) (incorporated by reference at 40 C.F.R. § 1054.15(c)); 13 CCR § 2405(b)(2) (incorporated by reference at California 1054 Test Procedure, § 1054.205(u)). Manufacturers are prohibited from selling, offering for sale, introducing into commerce, delivering for introduction into commerce, or importing, any new engine unless that engine is covered by an EPA-issued COC. CAA § 203(a)(1), 42 U.S.C. § 7522(a)(1); 40 C.F.R. § 1068.101(a)(1) (incorporated by reference at 40 C.F.R. § 1054.15(c)). It is also a violation to cause any of the foregoing acts. CAA § 203(a), 42 U.S.C. § 7522(a). Similarly, in California, manufacturers are prohibited from manufacturing for sale, selling, offering for sale, or introducing, delivering, importing into California for introduction into commerce, any SORE or LSI engine unless it is covered by a CARB-issued EO. 13 CCR §§ 2400(a)(2) and 2430(a)(2).

23.     This action pertains to Kohler's MYs 2011-2016 Small SI engines, which are governed by Parts 90 and 1054 and the California Test Procedures. Part 90 applies to Kohler's MY 2011 Small SI engines with a displacement less than 225 cubic centimeters. Part 1054 applies to the remainder of Kohler's MYs 2011-2016 Small SI engines.

24.     There are several aspects of the Small SI engine certification program relevant to this complaint, which are summarized below. The summary focuses on the Part 1054 requirements because a substantial majority of Small SI engines identified in this complaint are governed by those provisions. Part 90 includes similar requirements that apply to Kohler's MY 2011 Small SI engines with a displacement less than 225 cubic centimeters.

7

A.   **Emission Standards for Small SI Engines**

25.     The Act directs EPA to study emissions from nonroad engines and to establish emission standards if emissions from nonroad engines contribute significantly to nonattainment areas or to air pollution which may be reasonably be anticipated to endanger public health or welfare. CAA § 213(a)(1)-(4), 42 U.S.C. § 7547(a)(1). Specific statutory direction to propose standards for Small SI engines comes from section 428(b) of the 2004 Consolidated Appropriations Act, which requires EPA to propose regulations under the Act "that shall contain standards to reduce emissions from new nonroad spark-ignition engines smaller than 50 horsepower." Pub. L. 108–199, Div G, Title IV, § 428(b), 118 Stat. 418 (January 23, 2004).

26.     The California Health and Safety Code directs CARB to adopt and implement emission standards for mobile sources, which CARB has found to be necessary, cost effective, and technologically feasible, to reduce air pollution and accomplish the attainment of the state standards at the earliest practicable date. Cal. Health & Saf. Code §§ 43101, 43000.5, 43013, 43018.

27.     Both federal and state regulations contain exhaust emission standards for HC plus NOx ("HC + NOx") that apply to Small SI Engines. *See* 40 C.F.R. § 1054.105 (specifying emission standards for nonhandheld Small SI engines); 13 CCR §§ 2403(b) and 2433(b) (same). The specific numeric standards for HC + NOx are referred to herein as "default limits." The default limits vary depending on the engine displacement class.

28.     As an alternative to meeting the default limits, a manufacturer may participate in the ABT program (except for LSI engines sold in California). *See* 40 C.F.R. §§ 1054.105(b), 1054, Subpart H; 13 CCR §§ 2403(e), 2408 *et seq*., and 2433(b).

29.     The ABT programs allow a manufacturer to choose a HC + NOx limit for each of its engine families (subject to certain emission "caps"). *See* 40 C.F.R. § 1054.105(b); 13 CCR §§ 2403(e) and 2408 *et seq.*; California 1054 Test Procedures, § 1054.105(b). This limit – called a "Family Emission Limit" or "FEL" – serves as the applicable emission standard for the engine family. 40 C.F.R. § 1054.105(b); 13 CCR §§ 2403(e) and 2408(b)(2); California 1054 Test Procedures, § 1054.105(b).

8

30.    The maximum FEL (or "cap") for a Class II Small SI engine is 12.1 g/kW-hr. 40 C.F.R. § 1054.105(b); 13 CCR §§ 2408(b)(6) and 2409 *et seq.*

31.    A manufacturer generates emission credits when the FEL is less than the default limits. These credits can be used to offset emissions from engine families that have FELs higher than the default limits, banked for use in future years, or traded to another manufacturer. The manufacturer must not, at the end of the year, have a negative ABT emissions credit balance. *See* 40 C.F.R. §§ 1054.710 and 1054.730(c)(1); 13 CCR §§ 2408(b)(5) and 2409 *et seq.*

32.    Manufacturers who participate in the ABT program must submit to EPA an end-of-year report within 90 days after the end of the model year and a final report within 270 days after the end of the model year. 40 C.F.R. § 1054.730(a). These reporting deadlines are the same under CARB regulations for both the end-of-year reports and final reports. 13 CCR §§ 2408(i)(3)(A)-(B) and 2409(h). These reports must contain the number of emission credits generated or used for each engine family and the net balance of emission credits from all the manufacturer's participating engine families. 40 C.F.R. §§ 1054.730(b) and (c); 13 CCR §§ 2408(i) and 2409(h). Kohler participated in the ABT programs prior to and during the relevant time period, and continues to participate in the ABT programs.

**B.    Test Cycle**

33.    For certification purposes, nonhandheld Small SI engines are tested under a six-mode duty cycle. 40 C.F.R. § 1054.505(b)(2); California 1054 Test Procedures, § 1054.505(b)(2). During mode 6, which is a no-load mode at idle speed, manufacturers must allow the engine to operate at the idle speed determined by the installed governor. 40 C.F.R. §§ 1054.505(b), (c)(1); California 1054 Test Procedures, §§ 1054.505(b), (c)(1). During mode 1, which is full-load operation, the regulations instruct the following:

[S]elect a test speed of either 3060 [revolutions per minute (rpm)] or 3600 rpm that is most appropriate for the engine family. If all the engines in the engine family are used in intermediate-speed equipment, select a test speed of 3060 rpm. The test associated with intermediate-speed operation is referred to as the A Cycle. If all the engines in the engine family are used in rated-speed equipment, select a test speed of 3600 rpm. The test

9

associated with rated-speed operation is referred to as the B Cycle. If an engine family includes engines used in both intermediate-speed equipment and rated-speed equipment, select the test speed for emission-data engines that will result in worst-case emissions. 40 C.F.R. § 1054.505(d)(1); California 1054 Test Procedures, § 1054.505(d)(1). "Rated-speed equipment" is defined as "nonhandheld equipment in which the installed engine is intended for operation at a rated speed that is nominally 3600 rpm or higher." 40 C.F.R. § 1054.801. In California, the definition is similar but omits the word "nonhandheld" before the word "equipment." California 1054 Test Procedures, § 1054.801. "Intermediate-speed equipment" is defined as "nonhandheld equipment in which the installed engine is intended for operation at speeds substantially below 3600 rpm." 40 C.F.R. § 1054.801; California 1054 Test Procedures, § 1054.801.

34.     For modes 2-5 (which are run at various loads between no load and full load), manufacturers may either test the engines at the test speeds prescribed by Test Cycle A or B (as applicable) or let the installed governor control engine speed (which is referred to as "variable speed" testing). 40 C.F.R. § 1054.505(b); California 1054 Test Procedures, § 1054.505(b).

35.     During the relevant time period, Kohler elected to test its Small SI Engines at the test speeds prescribed by Test Cycle A or B in modes 2-5.

**C.     Disclosure of AECDs/Adjustable Parameters**

36.     Certification applications must, among other things, describe in detail all AECDs and adjustable parameters equipped on the engines in that engine family. 40 C.F.R. §§ 1054.205(b), (q); California 1054 Test Procedures, §§ 1054.205(b), (q).

37.     An AECD is defined as "any element of design that senses temperature, motive speed, engine RPM, transmission gear, or any other parameter for the purpose of activating, modulating, delaying, or deactivating the operation of any part of the emission control system." 40 C.F.R. § 1054.801; California 1054 Test Procedures, § 1054.801.

38.     Adjustable parameters are defined as "any device, system, element of design that someone can adjust (including those which are difficult to access) and that, if adjusted, may affect emissions or engine performance during emission testing or normal in-use operation." 40

10

C.F.R. § 1054.801; California 1054 Test Procedures, § 1054.801.

**D.   Defeat Device and Tampering Prohibition**

39.    Certification applications must include sufficient detail to allow EPA and CARB to evaluate whether the AECDs are consistent with the defeat device prohibition. 40 C.F.R. § 1054.205(b); California 1054 Test Procedures, § 1054.205(b). A defeat device is an AECD "that reduces the effectiveness of emission controls under conditions that the engine may reasonably be expected to encounter during normal operation and use." 40 C.F.R. § 1054.115(e); California 1054 Test Procedures, § 1054.115(e). Engines equipped with defeat devices cannot be certified. 40 C.F.R. §§ 1054.115(e) and 1068.101(b)(2); California 1054 Test Procedures, § 1054.115(e).

40.    In the preamble to the final rule promulgating Part 1054, EPA explained:

> To avoid a situation where engines are designed to control emissions over the test cycle, with less effective controls under similar modes of operation that engines experience in use, we are adding a requirement for manufacturers to provide an explanation in the application for certification if air-fuel ratios are significantly different for governed and ungoverned operation at wide-open throttle, especially for fuel-injected engines. Manufacturers would need to explain why this emission control strategy is not a defeat device.

73 Fed. Reg. 59,034, 59,084 (Oct. 8, 2008).

**E.   Test Procedures**

41.    Under 40 C.F.R. § 1054.501(b) and California 1054 Test Procedures, § 1054.501(b), manufacturers must follow certain procedures outlined in Part 1065 to demonstrate compliance with the exhaust emission standards. Part 1065 governs, among other things: (1) equipment used for engine testing; (2) measurement instruments used for testing; (3) calibration and performance verifications for measurement systems; (4) how to prepare engines for testing, including service accumulation; (5) how to run an emission test over a predetermined duty cycle; (6) test procedure calculations; (7) fuels, engine fluids, analytical gases, and other calibration standards; and (8) special procedures related to oxygenated fuels.

42.    The Part 1065 testing procedures apply to MY 2013 and later Small SI engines.

11

*See* 40 C.F.R. §§ 1054.15(b), 1054.145(j). However, testing results which were obtained using the previous test procedures (i.e., Part 90) for a MY 2012 or earlier engine may still be relied on as carryover data in accordance with 40 C.F.R. § 1054.235(d) provided that the design is unchanged and emissions are expected to be identical. In California, California 1065 Test Procedures apply to MY 2013 and later SORE and LSI engines, except that manufacturers are allowed to use the 2005-2012 California Test Procedures for the 2013 and 2014 model years, and manufacturers can continue to use data based on the test procedures in the 2005-2012 California Test Procedures for engine families in 2014 and later model years, provided they use carryover emission data under 40 CFR 1054.235(d) for that engine family. California 1054 Test Procedures, § 1054.145.

F.    **Aging Emissions Components**

43.    An emission family is considered in compliance with the emission standards in 40 C.F.R. §1054.101(a) if all emission-data engines representing that family have test results showing deteriorated emission levels at or below the standards. 40 C.F.R. § 1054.240(a); California 1054 Test Procedures, § 1054.240(a). "Deteriorated emission level" is defined as "the emission level that results from applying the appropriate deterioration factor to the official emission results of the emission-data engine." 40 C.F.R. § 1054.801; California 1054 Test Procedures, § 1054.801.

44.    To establish deterioration factors, manufacturers must age emission data engines and conduct testing towards the middle and end of their useful life (up to 1,000 hours). To ensure valid test results, when conducting testing on emission data engines—whether low-hour, midpoint, or end of useful life—the engines must be "tested as they will be produced," which "include[s] consideration of wear and other causes of deterioration expected under typical consumer use when they measure emission from the emission data engine." 40 C.F.R. §§ 1054.235(a) and 1054.245(b); California 1054 Test Procedures, §§ 1054.235(a) and 1054.245(e)(2)(i). Emission-related components (e.g., catalysts, oxygen sensors, etc.) must be aged as well when conducting midpoint and end of useful life testing. 40 C.F.R. §§ 1054.235(a) and 1054.245(b); California 1054 Test Procedures, §§ 1054.235(a) and 1054.245(e)(2)(ii). *See*

12

*also* 40 C.F.R. §§ 1065.410 (establishing what type of maintenance is permissible when aging an engine for end of useful life emission testing) and 1054.245(b)(9) (requiring that manufacturers use good engineering judgment when establishing deterioration factors).

**G.   Amendments to Certification Applications**

45.   After manufacturers have been issued a COC, manufacturers are required to amend their certification application (commonly referred to as a "running change") before: (1) changing a configuration in an emission family in a way that may affect emissions, or (2) changing any of the components described in the application for certification. 40 C.F.R. §§ 1054.225(a)(1)-(2); California 1054 Test Procedure, § 1054.225(a)(1)-(2). In addition, manufacturers are required to submit a running change any time they seek to modify an FEL for an emission family before the end of the model year. 40 C.F.R. § 1054.225(a)(3); 13 CCR § 2408(g)(1)(B).

**H.   PLT Testing**

46.   A manufacturer must demonstrate compliance with the applicable emission standards for each of its engine families by performing production line testing ("PLT"). *See* 40 C.F.R. § 1054.300; 13 CCR § 2407 *et seq.*; California 1054 Test Procedure, § 1054.300.

47.   The PLT requirements for Small SI engines are found in 40 C.F.R. Part 1054, Subpart D and California 1054 Test Procedures, Subpart D.

48.   PLT involves randomly selecting engines from the end of the assembly line and testing those engines to demonstrate that the applicable emission standards are being met. 40 C.F.R. §§ 1054.310(b) and 1054.305(a); 13 CCR § 2407(b)(7).

49.   Engines selected for testing must be assembled in a way that is representative of other engines in the engine family. 40 C.F.R. § 1054.305.

50.   Once an engine is selected for testing, it may not be adjusted, repaired, prepared, or modified except under specific, limited circumstances. 40 C.F.R. § 1054.305(b); 13 CCR § 2407(a)(4).

51.   The emission results from PLT are used to determine (a) the minimum number of engines from the engine family that must be tested and (b) whether the engine family, as a

13

1    whole, meets the applicable emission standards.

2        52.    The minimum number of engines that must be tested is determined by the

3    required sample-size (sometimes referred to as the "N-value") equation. The federal sample-size

4    equation is set forth in 40 C.F.R. § 1054.310(c) and California's sample size equation is set forth

5    in 13 CCR § 2407(c)(2)(B)(1).

6        53.    Whether an engine family, as a whole, meets the applicable emission standards is

7    determined by the "Cumulative Sum" ("CumSum") equation. The CumSum equation is set forth

8    in 40 C.F.R. 1054.315(b) and 13 CCR § 2407 (c)(3).

9        54.    If an engine fails its PLT emission test, manufacturers may fix the engine to

10   correct the problem and re-test the engine. If the engine passes a re-test it can be sold, but the

11   results of the re-tests cannot be included in the required sample-size and CumSum calculations

12   unless the manufacturer makes the same modification to every other engine in that engine

13   family. *See* 40 C.F.R. § 1054.305(b); 13 CCR §§ 2407(c)(3)(A)(4) and 2407(d)(6).

14       **I.**    **PLT Reports**

15       55.    A manufacturer is required to report certain information about its production line

16   testing to EPA and CARB (hereafter "PLT report"). 40 C.F.R. § 1054.345(a); 13 CCR §

17   2407(c)(4).

18       56.    Each PLT report must contain the information set forth in 40 C.F.R. § 1054.345,

19   including "all initial test results; final test results; and final deteriorated test results for all tests"

20   and "the CumSum analysis required in § 1054.315 and the sample-size calculation required in §

21   1054.310 for each engine family." 40 C.F.R. §§ 1054.345(a)(6), (8). California requires similar

22   information. *See* 13 CCR §§ 2407(c)(4)(E)(1)-(11).

23       **J.**    **Evaporative Emissions**

24       57.    California's evaporative emission standards includes diurnal performance

25   standards. "Evaporative emissions" are "emissions that result from the evaporation of reactive

26   organic gases into the atmosphere." 13 CCR § 2752(a)(6). Any engine or equipment that is

27   manufactured for sale, sold, or offered for sale in California, or that is introduced, delivered, or

28   imported into California for introduction into commerce, must have an evaporative emission

                                            14

control system that has been certified and labeled to performance-based standards (expressed in grams of hydrocarbons per day (g/day)). *See* 13 CCR §§ 2754-2765.

**K.** **Enforcement Provisions**

58.     Section 213(d) of the Act, 42 U.S.C. § 7547(d), provides that regulations applicable to nonroad Small SI engines shall be enforced in the same manner as the standards for new motor vehicles and new motor vehicle engines. The standards for new motor vehicles and new motor vehicle engines are enforced pursuant to Sections 203 (Prohibited Acts), 204 (Actions to Restrain Violations), and 205 (Civil Penalties), 42 U.S.C. §§ 7522, 7523, and 7524.

59.     This Court has jurisdiction to restrain violations of Section 7522(a). 42 U.S.C. §§7522(a), 7523(a).

60.     Anyone who violates Section 203(a)(1) of the Act, 42 U.S.C. § 7522(a)(1), is subject to a penalty of up to $25,000 per engine. 42 U.S.C. § 7524(a). Pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990, 28 U.S.C. § 2461, as amended, the maximum penalty for violations occurring after January 12, 2009 and before November 3, 2015 is $37,500 per engine. 40 C.F.R. § 19.4. The maximum penalty for violations occurring after November 2, 2015 is $47,357 per engine. 40 C.F.R. § 19.4.

61.     Anyone who violates Section 203(a)(3)(B) of the Act, 42 U.S.C. § 7522(a)(3)(B), is subject to a penalty of up to $2,500 per engine. 42 U.S.C. § 7524(a). Pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990, 28 U.S.C. § 2461, as amended, the maximum penalty for violations occurring after January 12, 2009 and before November 3, 2015 is $3,750 per engine. 40 C.F.R. § 19.4. The maximum penalty for violations occurring after November 2, 2015 is $4,735 per engine.

62.     Anyone who violates Section 203(a)(2) of the Act, 42 U.S.C. § 7522(a)(2), is subject to a penalty of up to $25,000 per day of violation. 42 U.S.C. § 7524(a). Pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990, 28 U.S.C. § 2461, as amended, the maximum penalty for violations occurring after January 12, 2009 and before November 3, 2015 is $37,500 per day of violation. 40 C.F.R. § 19.4. The maximum penalty for violations occurring after November 2, 2015 is $47,357 per day of violation.

15

63.     Under California's Health and Safety Code § 43016, anyone who violates "any regulation of the state board" shall be subject to a civil penalty of up to $500 per SORE engine, and under California Health and Safety Code § 43154 subject to a civil penalty of up to $5,000 per LSI engine.

## GENERAL ALLEGATIONS

64.     Kohler manufactures nonhandheld Small SI engines that are intended for sale in the United States, including in California. These engines must be covered by a valid COC issued by EPA and/or an EO from CARB, *see* CAA § 203(a)(1), 42 U.S.C. § 7522(a)(1); Cal. Health & Saf. Code § 43102, 13 CCR §§ 2400(a)(2), 2430(a)(2), and comply with the requirements of 40 C.F.R. Parts 90, 1054, 1065, and/or 1068 or 13 CCR §§ 2403 *et seq.*, 2407 *et seq.*, 2408 *et seq.*, 2409 *et seq.*, and 2433 *et seq.*

65.     From 2010 to 2016, Kohler applied for and received COCs and EOs purportedly covering millions of Small SI engines, including COCs and EOs for each engine family listed in Table 1 below. These engines were sold to original equipment manufacturers and distributors within the United States, including in California.

| Table 1 Kohler Engine Families Not Covered By a Valid COC or EO (Families in plain font are carbureted engines; families in *italicized* font are EFI engines; families in ***bold italicized*** font are EFI engines equipped with Delphi ECMs, defined as Subject Engines below.) | | | | | |
|---|---|---|---|---|---|
| **MY 2011** | **MY 2012** | **MY 2013** | **MY 2014** | **MY 2015** | **MY 2016** |
| BKHXS.1491GB | CKHXS.1491GB | DKHXS.1491GA | EKHXS.1491GA | FKHXS.1491GA | GKHXS.1491GA |
| BKHXS.1491GD | CKHXS.1731GB | DKHXS.1491GB | EKHXS.1491GB | FKHXS.1731GB | GKHXS.1731GB |
| BKHXS.1731GB | CKHXS.1961GA | DKHXS.1731GB | EKHXS.1731GB | FKHXS.1731GB | GKHXS.1731GC |
| BKHXS.1731GD | CKHXS.2081GA | DKHXS.1961GA | EKHXS.1961GA | FKHXS.1961GA | GKHXS.1961GA |
| BKHXS.1961GA | CKHXS.2772GA | DKHXS.2081GA | EKHXS.1961GC | FKHXS.1961GC | GKHXS.1961GC |
| BKHXS.2081GA | CKHXS.4262NP | DKHXS.2772GA | EKHXS.2081GA | FKHXS.2081GA | GKHXS.2081GA |
| BKHXS.2081GD | CKHXS.4292GA | DKHXS.4262NP | EKHXS.2772GA | FKHXS.2772GA | GKHXS.2772GA |
| BKHXS.2772GA | CKHXS.5972GB | DKHXS.4292GA | EKHXS.4292GA | FKHXS.4292GA | GKHXS.2772TF |

16

| | | | | | |
|---|---|---|---|---|---|
| BKHXS.4262NP | CKHXS.5972GN | DKHXS.5972GB | EKHXS.5972GB | FKHXS.5972GB | GKHXS.4292GA |
| BKHXS.4292GA | CKHXS.5972GW | DKHXS.5972GN | EKHXS.5972GN | FKHXS.5972GN | *GKHXS.4292PD* |
| BKHXS.5972GB | CKHXS.6242GC | DKHXS.5972GW | EKHXS.5972GW | FKHXS.5972GW | GKHXS.4292TF |
| BKHXS.5972GN | *CKHXS.6742GA* | DKHXS.6242GC | EKHXS.6242GC | FKHXS.5972NB | GKHXS.5972GB |
| BKHXS.5972GW | CKHXS.6742GC | *DKHXS.6742GA* | *EKHXS.6742GA* | FKHXS.6242GC | GKHXS.5972NB |
| BKHXS.6242GA | CKHXS.6742GG | DKHXS.6742GC | EKHXS.6742GC | FKHXS.6742GC | GKHXS.6242GC |
| BKHXS.6242GC | ***CKHXS.6942PC*** | DKHXS.6742GG | EKHXS.6742GG | FKHXS.6742GG | GKHXS.6742GC |
| *BKHXS.6742GA* | CKHXS.7252GB | ***DKHXS.6942PC*** | ***EKHXS.6942PC*** | ***FKHXS.6942PC*** | GKHXS.6742GG |
| BKHXS.6742GC | CKHXS.7252GC | DKHXS.7252GB | EKHXS.7252GB | ***FKHXS.6942PD*** | *GKHXS.6942PD* |
| BKHXS.6742GG | CKHXS.7252GV | DKHXS.7252GC | EKHXS.7252GC | FKHXS.7252GB | GKHXS.7252GC |
| ***BKHXS.6942PC*** | CKHXS.7252LA | DKHXS.7252GV | EKHXS.7252GV | FKHXS.7252GC | GKHXS.7252GV |
| BKHXS.7252GB | CKHXS.7252NA | DKHXS.7252LA | EKHXS.7252LA | FKHXS.7252GV | GKHXS.7252LA |
| BKHXS.7252GC | *CKHXS.7252PC* | DKHXS.7252NA | EKHXS.7252NA | FKHXS.7252LA | GKHXS.7252NA |
| BKHXS.7252GV | CKHXS.7472GC | *DKHXS.7252PC* | *EKHXS.7252PC* | FKHXS.7252NA | GKHXS.7252NB |
| BKHXS.7252LA | ***CKHXS.7472PC*** | DKHXS.7472GC | EKHXS.7472GC | FKHXS.7252NB | GKHXS.7252ND |
| BKHXS.7252NA | *CKHXS.7472PH* | ***DKHXS.7472PC*** | ***EKHXS.7472PC*** | FKHXS.7252ND | GKHXS.7472GB |
| *BKHXS.7252PC* | CKHXS.9992GC | ***DKHXS.7472NC*** | ***EKHXS.7472NC*** | *FKHXS.7252PC* | GKHXS.7472GC |
| BKHXS.7472GC | CKHXS.9992GD | *DKHXS.7472PH* | *EKHXS.7472PH* | FKHXS.7472GC | GKHXS.7472GD |
| ***BKHXS.7472PC*** | CKHXS.9992NA | DKHXS.9992GC | EKHXS.9992GC | ***FKHXS.7472PC*** | GKHXS.7472GE |
| *BKHXS.7472PH* | | DKHXS.9992GD | EKHXS.9992GD | ***FKHXS.7472PD*** | *GKHXS.7472PC* |
| *BKHXS.7472PM* | | DKHXS.9992NA | EKHXS.9992NA | *FKHXS.7472PM* | *GKHXS.7472PD* |
| BKHXS.9992GC | | ***DKHXS.9992PC*** | ***EKHXS.9992PC*** | ***FKHXS.7472NC*** | *GKHXS.7472PE* |
| BKHXS.9992NA | | | | *FKHXS.7472PH* | ***GKHXS.7472NC*** |
| | | | | ***FKHXS.8242PD*** | *GKHXS.7472ND* |
| | | | | FKHXS.9992GC | *GKHXS.7472PH* |
| | | | | FKHXB.9992DA | *GKHXS.7472PM* |
| | | | | ***FKHXS.9992PC*** | ***GKHXS.8242PD*** |

17

| | | | | *FKHXS.9992PD* | *GKHXS.8242ND* |
|---|---|---|---|---|---|
| | | | | | GKHXS.9992GC |
| | | | | | GKHXB.9992DA |
| | | | | | *GKHXS.9992PD* |

## **FIRST CLAIM FOR RELIEF**

(Violations of Section 203(a)(1) of the Act: Introducing into Commerce Engines

Not Covered by a Certificate of Conformity)

66.     The foregoing paragraphs are re-alleged and incorporated herein by reference.

67.     Kohler submitted to EPA applications for COCs which included, among other things, information pertaining to test cycle selection, test procedures, applicable emissions limit(s), establishment of deterioration factors, and AECDs and adjustable parameters equipped on the engines.

68.     A substantial majority of the Small SI engines within the engine families referenced in Table 1 manufactured by Kohler were not covered by a COC because the engines did not conform in all material respects to their certification applications, in violation of Section 203(a)(1) of the Act, 42 U.S.C. § 7522(a)(1). These engines did not conform to their certification applications for one or more of the following reasons: (1) using the wrong test cycle, (2) not fully complying with the test procedures Kohler certified to, (3) failing to comply with the applicable emission limits, (4) failing to age emission-related components for deterioration factor testing, (5) failing to disclose AECDs and adjustable parameters equipped on the engines, and/or (6) changes were made to the production engines without amending the certification application covering those engines.

69.     Kohler violated and continues to violate Section 203(a)(1) of the Act, 42 U.S.C. § 7522(a)(1), by selling, offering for sale, introducing into commerce, delivering for introduction into commerce, or importing new engines that were not covered by a COC, or by causing any of the forgoing acts.

70.     Each such violation of Section 203(a)(1) of the Act, 42 U.S.C. § 7522(a)(1), is a

1    separate offense with respect to each new engine.

2    71.    Pursuant to Section 205(a) of the Act, 42 U.S.C. § 7524(a), 40 C.F.R. § 19.4, and

3    40 C.F.R. § 1068.101(a)(1), Kohler is liable for civil penalties of up to $47,357 for each new

4    engine not covered by a certificate of conformity.

5    **SECOND CLAIM FOR RELIEF**

6    (Violations of Section 203(a)(1) of the Act: Introducing into Commerce Engines

7    Not Covered by a Certificate of Conformity – Subject Engines)

8    72.    The foregoing paragraphs are re-alleged and incorporated herein by reference.

9    73.    From 2010 to 2016, Kohler applied for and received COCs for Small SI engine

10    families that included engines equipped with Delphi ECMs ("Subject Engines"), which are

11    denoted in bold typeface in Table 1.

12    74.    On or about November 26, 2008, Kohler employees completed development of a

13    calibration for its Subject Engines ("Subject Calibration").

14    75.    A calibration includes, among other things, a fueling strategy. The fueling

15    strategy for Small SI engines senses engine speed and manifold absolute pressure ("MAP") and

16    activates the fuel injector(s) to inject into each cylinder a commanded amount of fuel based on

17    the engine speed and MAP inputs. The fueling strategy within the calibration is therefore an

18    "element of design" within the meaning of the CAA.

19    76.    The Subject Calibration commanded more fuel (i.e., ran rich) at 3,060 rpm, and

20    commanded much less fuel (i.e., ran lean) at speeds above 3,060 rpm. Therefore, the fueling

21    strategy in the Subject Calibration is an AECD.

22    77.    Kohler failed to disclose the fueling strategy in the Subject Calibration in its COC

23    applications covering the Subject Engines.

24    78.    The fueling strategy in the Subject Calibration does not meet any of the

25    exemptions outlined in 40 C.F.R. § 1054.115(c) because it was not disclosed in Kohler's

26    certification applications, and (1) the condition of concern (i.e., running lean at speeds above

27    3,060 rpm) was not substantially included in the applicable duty cycle test procedures because

28    Kohler selected the wrong test cycle, (2) the design is not necessary to prevent engine damage or

19

accidents, and (3) the fueling strategy did not only apply at start up. The preamble to the final rule promulgating Part 1054 stated that engines designed to control emissions over the test cycle by having a lower air-fuel ratio when compared to normal in-use operation would be considered engines equipped with defeat devices.

79.     The Subject Engines did not conform to the certification applications because the Subject Engines were equipped with an undisclosed AECD, and therefore were not covered by the COCs.

80.     Kohler violated Section 203(a)(1) of the Act, 42 U.S.C. § 7522(a)(1), by selling, offering for sale, introducing into commerce, delivering for introduction into commerce, or importing new engines that were not covered by a COC, or by causing any of the forgoing acts.

81.     Each such violation of Section 203(a)(1) of the Act, 42 U.S.C. § 7522(a)(1), is a separate offense with respect to each new engine.

82.     Pursuant to Section 205(a) of the Act, 42 U.S.C. § 7524(a), 40 C.F.R. § 19.4, and 40 C.F.R. § 1068.101(a)(1), Kohler is liable for civil penalties of up to $47,357 for each new engine not covered by a certificate of conformity.

### THIRD CLAIM FOR RELIEF

(Violations of Section 203(a)(3)(B): Manufacture, Sale, Offering for Sale, and Installation of Defeat Devices on the Subject Engines)

83.     The foregoing paragraphs are re-alleged and incorporated herein by reference.

84.     The Subject Calibration is a "component" within the meaning of the Act. Therefore, Kohler manufactured, sold, offered for sale, or installed components intended for use on the Subject Engines.

85.     The Subject Calibration was installed on all of the Subject Engines (except for certain MY 2016 engines that were equipped with an updated calibration), which are denoted in bold typeface in Table 1.

86.     All of the Subject Engines were certified under Test Cycle A (i.e., tested at 3,060 rpm) but should have been certified under Test Cycle B (i.e., tested at 3,600 rpm) because many of the engines were used in rated speed equipment.

20

87.     Because the Subject Calibration commanded more fuel at the certified test point (i.e., 3,060 rpm), HC + NOx emissions during certification testing were substantially lower than HC + NOx emissions at higher speeds (i.e., how the engines operated in-use). Therefore, a principal effect of the fueling strategy in the Subject Calibration was to bypass, defeat, or render inoperative an element of design installed on the Subject Engines.

88.     Kohler was aware that the Subject Engines operated at speeds substantially above 3,060 rpm in real-world operation.

89.     Kohler "knew or should have known" that the fueling strategy in the Subject Calibration bypassed, defeated, or rendered inoperative an emission control strategy because it was designed to maximize emissions performance during certification testing even though it was not representative of in-use operation.

90.     Kohler violated Section 203(a)(3)(B) of the Act, 42 U.S.C. § 7522(a)(3)(B), by manufacturing, selling, offering for sale, or installing "defeat devices" on the Subject Engines, or by causing any of the foregoing acts.

91.     Each part or component that constitutes a "defeat device" manufactured, sold, offered for sale, or installed on the Subject Engines (or the causing thereof) is a separate violation of Section 203(a)(3)(B) of the Act, 42 U.S.C. § 7522(a)(3)(B).

92.     Pursuant to Section 205(a) of the Act, 42 U.S.C. § 7524(a), 40 C.F.R. § 19.4, and 40 C.F.R. § 1068.101(b)(2), Kohler is liable for civil penalties of up to $4,735 for each Subject Engine equipped with the Subject Calibration.

## FOURTH CLAIM FOR RELIEF

(Violations of Section 203(a)(2) of the Act: Failure to Submit Complete or Accurate Reports)

93.     The foregoing paragraphs are re-alleged and incorporated herein by reference.

94.     Each certification application, ABT report, and PLT report is a "report" within the meaning of Section 208(a) of the CAA, 42 U.S.C. § 7542(a).

95.     During the relevant period, Kohler failed to disclose one or more AECDs for several EFI engine families and nearly all of the carbureted engine families identified in Table 1. In addition, all of the carbureted engine families identified in Table 1 were equipped with

1    undisclosed adjustable parameters. By failing to disclose these AECDs/adjustable parameters in

2    its certification applications, Kohler submitted inaccurate or incomplete reports to EPA.

3         96.    Kohler was required to perform production line testing, in accordance with 40

4    C.F.R. Part 1054, Subpart D, to demonstrate compliance with the applicable emission standards.

5    Kohler was required to submit periodic PLT reports to EPA, containing the information specified

6    in 40 C.F.R. § 1054.345(a). These reports were required to be accurate and complete. 40 C.F.R.

7    § 1068.101(a)(2). *See also* 40 C.F.R. § 1054.345(c). Kohler submitted PLT reports to EPA which

8    omitted certain PLT tests or failed to include the minimum number of PLT tests required by the

9    regulations, in violation of Section 203(a)(2)(A) of the Act, 42 U.S.C. § 7522(a)(2)(A), 40

10   C.F.R. § 1054.345(c), and 40 C.F.R. § 1068.101(a)(2).

11        97.    Based on Kohler's use of the wrong test cycle, wrong test procedure, and defeat

12   devices, Kohler understated the emissions values in its ABT reports, which resulted in Kohler

13   generating more HC + NOx credits than it was entitled to generate.

14        98.    Kohler also reported inaccurate FEL values for certain engine families in its ABT

15   reports.

16        99.    Kohler violated Section 203(a)(2) of the Act, 42 U.S.C. § 7522(a)(2), by failing to

17   submit complete and accurate reports.

18        100.   Each incomplete or inaccurate report is a separate violation of Section 203(a)(2)

19   of the Act, 42 U.S.C. § 7522(a)(2).

20        101.   Pursuant to Section 205(a) of the Act, 42 U.S.C. § 7524(a), 40 C.F.R. § 19.4, and

21   40 C.F.R. § 1068.101(a)(2), Kohler is liable for civil penalties of up to $47,357 per day of

22   violation for each reporting violation.

23                           **FIFTH CLAIM FOR RELIEF**

24        (Violations of California Health and Safety Code §§ 43016 and 43154: Introducing into

25                       California Engines Not Covered by an EO)

26        102.   The foregoing paragraphs are re-alleged and incorporated herein by reference.

27        103.   During the relevant period, Kohler applied for and received EOs for SORE and

28   LSI engine families identified in Table 1, purportedly covering engines that were sold to original

                                              22

equipment manufacturers and distributors within California.

104. Kohler submitted to CARB applications for EOs, which included, among other things, information pertaining to test cycle selection, test procedures, applicable emissions limit(s), establishment of deterioration factors, and AECDs and adjustable parameters equipped on the engines.

105. These new engines were not covered by an EO because the engines did not conform in all material respects to their certification applications, in violation of 13 CCR §§ 2403 and 2433. These engines did not conform to their certification applications for one or more of the following reasons: (1) using the wrong test cycle, (2) using the wrong test procedures, (3) failing to comply with the applicable emission limits, (4) failing to age emission-related components for deterioration factor testing, (5) failing to disclose AECDs and adjustable parameters equipped on the engines, and/or (6) changes were made to the production engines without amending the certification application covering those engines.

106. Kohler violated 13 CCR §§ 2403(b)(1) and 2433 by manufacturing for sale, selling, offering for sale, introducing, delivering, or importing SORE and LSI engines into the State of California that were not covered by an EO, or by causing any of the foregoing acts.

107. Each such violation of 13 CCR §§ 2403(b)(1) and 2433 is a separate offense with respect to each new engine.

108. Pursuant to the California's Health and Safety Code sections 43016 and 43154, Kohler is liable for a civil penalty of up to $500 for each SORE engine that is in violation of the regulation and $5,000 for each LSI engine that is in violation of the regulation.

## SIXTH CLAIM FOR RELIEF

(Violations of California Health and Safety Code §§ 43016 and 43154: Introducing into California Engines Not Covered by an EO – California Subject Engines)

109. The foregoing paragraphs are re-alleged and incorporated herein by reference.

110. During the relevant period, Kohler applied for and received EOs for SORE and LSI engine families equipped with Delphi ECMs, purportedly covering engines in California ("California Subject Engines"), which include all engine families denoted in bold in Table 1

23

1   except engine families FKHXS.9992PC and FKHXS.9992PD.

2       111.    Kohler failed to disclose the fueling strategy in the Subject Calibration in its EO

3   applications covering the Subject Engines. California 1054 Test Procedure, § 1054.115(c).

4       112.    These new engines did not conform in all material respects to the certification

5   applications because the California Subject Engines were equipped with an undisclosed AECD,

6   and therefore were not covered by the EOs.

7       113.    Kohler violated 13 CCR §§ 2400(a)(2) and 2430(a)(2), by manufacturing for sale,

8   selling, offering for sale, introducing into commerce, delivering for introduction into commerce,

9   or importing new engines that were not covered by an EO, or by causing any of the forgoing

10  acts.

11      114.    Each such violation of 13 CCR §§ 2400(a)(2) and 2430(a)(2) is a separate offense

12  with respect to each new engine.

13      115.    Pursuant to the California's Health and Safety Code sections 43016 and 43154,

14  Kohler is liable for a civil penalty of up to $500 for each SORE engine that is in violation of the

15  regulation and $5,000 for each LSI engine that is in violation of the regulation.

16      **SEVENTH CLAIM FOR RELIEF**

17  (Violations of California Health and Safety Code §§ 43016 and 43154: Manufacture, Sale,

18  Offering for Sale, and Installation of Defeat Devices on California Subject Engines)

19      116.    The foregoing paragraphs are re-alleged and incorporated herein by reference.

20      117.    A calibration strategy is a "component" within the meaning of the 13 CCR §

21  2403(d) and 13 CCR § 2433(d), which incorporates the prohibitions in California Test Procedure

22  1054.115. Therefore, Kohler manufactured, sold, offered for sale, or installed components

23  intended for use on the California Subject Engines.

24      118.    Kohler was aware that the California Subject Engines operated at speeds

25  substantially above 3,060 rpm in real-world operation and therefore "knew or should have

26  known" that the fueling strategy in the California Subject Calibration bypassed, defeated, or

27  rendered inoperative an emission control strategy because it was designed to maximize emissions

28  performance during certification testing even though it was not representative of in-use

24

operation.

119.    Kohler violated 13 CCR §§ 2403(d) and 2433(d) by manufacturing, selling, offering for sale, or installing "defeat devices" on new SORE and LSI engines, or by causing any of the foregoing acts.

120.    Each part or component that constitutes a "defeat device" manufactured, sold, offered for sale, or installed on new SORE and LSI engines (or the causing thereof) is a separate violation of 13 CCR §§ 2403(d) and 2433(d).

121.    Pursuant to California's Health and Safety Code sections 43016 and 43154, Kohler is liable for a civil penalty of up to $500 for each SORE engine that is in violation of the regulation and $5,000 for each LSI engine that is in violation of the regulation.

## EIGHTH CLAIM FOR RELIEF

(Violations of California Health and Safety Code §§ 43016 and 43154:

Failure to Submit Complete or Accurate Reports)

122.    The foregoing paragraphs are re-alleged and incorporated herein by reference.

123.    Each certification application, ABT report, and PLT report is a "report" within the meaning of 13 CCR §§ 2403, 2407(c)(4)(E), 2408(i), and 2433.

124.    During the relevant period, Kohler failed to disclose one or more AECDs for several EFI engine families and nearly all of the carbureted engine families identified in Table 1. In addition, all of the carbureted engine families identified in Table 1 were equipped with undisclosed adjustable parameters. By failing to disclose these AECDs/adjustable parameters in its certification applications, Kohler submitted inaccurate or incomplete reports to CARB.

125.    Kohler was required to perform production line testing, in accordance with California 1054 Test Procedures, Subpart D, to demonstrate compliance with the applicable emission standards. Kohler was required to submit quarterly PLT reports to CARB, containing the information specified in 13 CCR § 2407(c)(4). These reports were required to be accurate and complete. Kohler submitted incomplete PLT reports to CARB, which omitted certain PLT tests or failed to include the minimum number of PLT tests required by the regulations, in violation of 13 CCR § 2407(c)(4).

126.    Based on Kohler's use of the wrong test cycle, wrong test procedure, and defeat devices, Kohler understated the emissions values in its ABT reports, which resulted in Kohler generating more HC + NOx credits.

127.    Kohler also reported inaccurate FEL values and failed to include the FEL values for certain engine families in its ABT reports. Kohler also failed to submit certain ABT reports.

128.    Kohler violated 13 CCR §§ 2403, 2407(c)(4)(E), 2408(i), and 2433 by failing to submit complete and accurate reports and failing to submit all required reports.

129.    Each incomplete, inaccurate, or missing report is a separate violation of 13 CCR §§ 2403, 2407(c)(4)(E), 2408(i), and 2433.

130.    Pursuant to California's Health and Safety Code sections 43016 and 43154, Kohler is liable for a civil penalty of up to $500 for each SORE engine that is in violation of the regulation and $5,000 for each LSI engine that is in violation of the regulation.

## NINTH CLAIM FOR RELIEF

(Violations of California Health and Safety Code § 43016:

Introducing into California Engines Not Covered by an EO)

131.    The foregoing paragraphs are re-alleged and incorporated herein by reference.

132.    Kohler applied for and received EO U-U-005-0507 for SORE in evaporative family CM1, which included engine family GKHXS.1961GA.  These engines were sold to original equipment manufacturers and distributors within California.

133.    The emission standard for the CM1 evaporative family is set forth in 13 CCR § 2754. CARB tested Kohler engines and these engines exceeded the evaporative emission standards set forth in 13 CCR § 2765.

134.    Engines that were introduced into California did not conform in all material respects to their certification applications because they failed to comply with the applicable evaporative emission limits, in violation of 13 CCR § 2765.

135.    Kohler violated 13 CCR §§ 2754 and 2765 by manufacturing for sale, selling,

1  offering for sale, introducing, delivering, or importing SORE engines into the State of California
2  that were not covered by an EO, or by causing any of the foregoing acts.

3       136.    Each such violation of 13 CCR §§ 2754 and 2765 are a separate offense with
4  respect to each new engine.

5       137.    Pursuant to the California's Health and Safety Code section 43016, Kohler is
6  liable for a civil penalty of up to $500 for each SORE engine that is in violation of the regulation.

7
8                            **PRAYER FOR RELIEF**

9       WHEREFORE, the United States, and the People of the State of California, *ex rel.* CARB
10  request that this Court:

11       A.    Assess civil penalties against Kohler for each violation of the applicable
12  provisions of the Act, California Health and Safety Code, and corresponding federal and state
13  regulations, as permitted by law;

14       B.    Impose injunctive relief to prevent Kohler from continuing to violate the
15  applicable provisions of the Act, California Health and Safety Code, and corresponding federal
16  and state regulations, as permitted by law;

17       C.    Order Kohler to take appropriate steps to remedy its noncompliance, including
18  forfeiting all HC + NOx credits claimed by Kohler based on the under-reporting of emissions
19  values in MYs 2011-2016, and any other mitigation or corrective measures deemed appropriate;

20       D.    Award Plaintiffs their costs of this action; and

21       E.    Grant such other and further relief as the Court deems just and proper.

22                        Respectfully submitted,

23

24  FOR THE UNITED STATES OF AMERICA:

25

26  JEFFREY BOSSERT CLARK
27  Assistant Attorney General
   Environment and Natural Resources Division
28  U.S. Department of Justice

                          27

1

2

3
PATRICIA L. HURST (DCBN 438882)
Senior Counsel
4
U.S. Department of Justice
Environment and Natural Resources Division
5
Environmental Enforcement Section

6

7
DAVID L. ANDERSON (CABN 149604)
8
United States Attorney
SARA WINSLOW (DCBN 457643)
9
Chief, Civil Division
10
MICHELLE LO (NYBN 4325163)
Assistant United States Attorney
11
OF COUNSEL:

12
RYAN BICKMORE
13
Attorney-Advisor
U.S. Environmental Protection Agency, Region 9
14
75 Hawthorne Street
15
San Francisco, CA 94105
Telephone: (415) 972-3058
16
Facsimile: (415) 947-3553
Email: Bickmore.Ryan@epa.gov
17

18

19

20

21

22

23

24

25

26

27

28

28

1

2                      FOR THE PEOPLE OF THE STATE OF

3                      CALIFORNIA:

4                      XAVIER BECERRA

5                      Attorney General of California

6

7                      KURT WEISSMULLER (CABN 117187)

8                      JOSHUA M. CAPLAN (CABN 245469)
                        Deputy Attorneys General

9                      300 South Spring Street, Suite 1702
                        Los Angeles, CA 90013

10                   Telephone: (213) 269-6353
                        Facsimile: (213) 897-2802

11                   Emails:      Kurt.Weissmuller@doj.ca.gov

12                                Josh.Caplan@doj.ca.gov

13  OF COUNSEL:

14

15  ELLEN M. PETER
     Chief Counsel

16  California Air Resources Board
     1001 I Street

17  Sacramento, CA 95814

18  D. ARON LIVINGSTON
     Assistant Chief Counsel

19  California Air Resources Board
     1001 I Street

20  Sacramento, CA 95814

21

22  SHANNON MARTIN DILLEY (CABN 297804)
     Senior Counsel

23  California Air Resources Board
     1001 I Street

24  Sacramento, CA 95814
     Telephone: (916) 322-3940

25  Facsimile: (916) 322-3928

26  Email: shannon.dilley@arb.ca.gov

27

28

29

**EXHIBIT C**

JEFFREY BOSSERT CLARK
Assistant Attorney General
Environment and Natural Resources Division
U.S. Department of Justice
PATRICIA L. HURST (DCBN 438882)
Senior Counsel, Environmental Enforcement Section
150 M Street N.E.
Washington, D.C. 20002
Telephone: (202) 307-1242
Facsimile: (202) 514-0097
Email: Patricia.Hurst@usdoj.gov

DAVID L. ANDERSON (CABN 149604)
United States Attorney
SARA WINSLOW (DCBN 457643)
Chief, Civil Division
MICHELLE LO (NYBN 4325163)
Assistant United States Attorney
450 Golden Gate Avenue, Box 36055
San Francisco, California 94102-3495
Telephone: (415) 436-7180
Facsimile: (415) 436-6748
Email:  Michelle.Lo@usdoj.gov

*[Refer to signature pages for complete list of parties represented]*

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

UNITED STATES OF AMERICA and
PEOPLE OF THE STATE OF CALIFORNIA, *ex rel.*
CALIFORNIA AIR RESOURCES BOARD,

    *Plaintiffs,*

v.

KOHLER CO.,

    *Defendant.*

Civil No. 20-00683

**PARTIAL CONSENT DECREE**

**TABLE OF CONTENTS**

I.      JURISDICTION AND VENUE ..................................................................................... 4
II.     APPLICABILITY ......................................................................................................... 4
III.    DEFINITIONS .............................................................................................................. 6
IV.     CIVIL PENALTY ......................................................................................................... 8
V.      COMPLIANCE MEASURES ..................................................................................... 10
VI.     CORRECTION OF ABT REPORTS .......................................................................... 25
VII.    REPORTING REQUIREMENTS ............................................................................... 26
VIII.   STIPULATED PENALTIES ....................................................................................... 29
IX.     FORCE MAJEURE ..................................................................................................... 33
X.      DISPUTE RESOLUTION ........................................................................................... 35
XI.     INFORMATION COLLECTION AND RETENTION ................................................ 38
XII.    EFFECT OF SETTLEMENT/RESERVATION OF RIGHTS .................................... 40
XIII.   COSTS ......................................................................................................................... 42
XIV.    NOTICES ..................................................................................................................... 42
XV.     EFFECTIVE DATE ..................................................................................................... 44
XVI.    RETENTION OF JURISDICTION ............................................................................. 45
XVII.   MODIFICATION ........................................................................................................ 45
XVIII.  TERMINATION .......................................................................................................... 45
XIX.    PUBLIC PARTICIPATION ........................................................................................ 46
XX.     SIGNATORIES/SERVICE ......................................................................................... 46
XXI.    INTEGRATION ........................................................................................................... 47
XXII.   FINAL JUDGMENT ................................................................................................... 47
XXIII.  26 U.S.C. SECTION 162(F)(2)(A)(II) IDENTIFICATION ....................................... 48

ii

Plaintiff United States of America, on behalf of the United States Environmental Protection Agency ("EPA"), and Plaintiff People of the State of California, acting by and through Xavier Becerra, Attorney General of the State of California, *ex rel.* California Air Resources Board ("CARB"), have filed a complaint in this action concurrently with this Consent Decree, alleging in relevant part that Defendant Kohler Co. ("Defendant" or "Kohler") violated Sections 203, 204, 205, and 213(d) of the Clean Air Act (the "CAA" or "Act"), 42 U.S.C. §§ 7522, 7523, 7524, 7547(d), and regulations promulgated pursuant to Section 213(a) of the Act, 42 U.S.C. § 7547(a), and California Health and Safety Code Sections 43016, 43017, and 43154, and regulations promulgated pursuant to Sections 39600, 39601, 43013, 43016, 43017, 43101, 43102, and 43104 of the California Health and Safety Code.

The Complaint alleges that Kohler manufactured and sold or offered for sale small, nonroad, nonhandheld spark-ignition engines nationwide (which include both Small Off-Road ("SORE") engines and Large Spark-Ignition ("LSI") engines with displacements equal to or less than 1.0 liter under California's regulations) (collectively, "Small SI Engines"). The Complaint alleges that Kohler failed to comply with the applicable certification requirements set forth in 40 C.F.R. Parts 90, 1054, 1065, and Title 13 California Code of Regulations ("CCR") §§ 2403(d) and 2433(d), which incorporate test procedures (the "California Test Procedures"). The Complaint further alleges that these Small SI Engines do not conform in all material respects to the engine specifications described in the applications for the certificates of conformity ("COCs") or CARB executive orders ("EOs") that purportedly cover them. The Complaint alleges that Kohler violated Section 203(a)(1) of the CAA, 42 U.S.C. § 7522(a)(1) and 13 CCR §§ 2403(b)-(e), 2408, and 2433 (b)-(d), by selling these uncertified Small SI Engines nationwide, including in California.

The Complaint also alleges that Kohler developed and installed a calibration on its electronic fuel-injected ("EFI") Small SI Engines equipped with Delphi electronic control

modules ("ECMs") ("Subject Engines") that contained a fueling strategy that significantly reduced emissions of oxides of nitrogen ("NOx") during certification testing when compared to in-use operation. The Complaint alleges that Kohler violated Sections 203(a)(1) and 203(a)(3)(B) of the CAA, 42 U.S.C. §§ 7522(a)(1), 7522(a)(3)(B), California Health and Safety Code §§ 43016, 43154, and 13 CCR §§ 2403(d) and 2433(d), by failing to disclose the fueling strategy equipped on the Subject Engines, and by manufacturing, selling, and installing defeat devices on these Subject Engines nationwide, including in California.

The Complaint also alleges that each certification application is a "report" within the meaning of Section 208(a) of the CAA, and 13 CCR §§ 2403(d) and 2433(d), and that Kohler's failure to disclose AECDs and adjustable parameters in EPA and CARB certification applications constituted violations of Section 203(a)(2) of the CAA, 42 U.S.C. § 7522(a)(2), and 13 CCR §§ 2403(d) and 2433(d) (incorporating the requirements of California Test Procedures, §§ 1054.115(b), 1054.201, and 1054.205(b) and (q)). The Complaint alleges that Kohler also violated Section 203(a)(2) of the CAA and 13 CCR §§ 2403, 2407(c)(4)(E), 2408(i), and 2433, by submitting incomplete production line testing ("PLT") reports and inaccurate averaging, banking, and trading ("ABT") reports to EPA and CARB.

In the Complaint, CARB also alleges that Kohler manufactured and offered for sale in California SORE engines that did not conform in all material respects to the engine specifications described in the applications for the EO that purportedly covered them because the engines did not meet the applicable diurnal evaporative emission control requirements, in violation of 13 CCR §§ 2754-2765 ("California Evaporative Emissions Claims").

Plaintiffs seek penalties and injunctive relief for all of the violations alleged in the Complaint. All violations alleged in the Complaint are being resolved by this Decree, except for the California Evaporative Emissions Claims, which are being resolved in a separate partial consent decree.

2

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Nothing in this Consent Decree shall constitute an admission of any fact or law by Defendant arising out of the transactions or occurrences alleged in the Complaint, except for the purpose of enforcing the terms or conditions set forth herein.

Defendant self-disclosed violations to EPA and CARB in late 2015 and early 2016. Defendant has worked cooperatively with EPA and CARB following the self-disclosures to investigate, identify, and address the violations, including by commissioning a third-party audit of its internal emissions testing laboratory in 2016.

Defendant represents that, prior to lodging of this Consent Decree, Defendant took measures to enhance the regulatory compliance of its Engine Division, including: (1) initial and continuous review and revision of its internal policies, test procedures, standard operating procedures, and work instructions regarding compliance with Title II of the Clean Air Act and CARB's Small Off-Road Engine and Large Spark Ignition Requirements; (2) improvement of its training and organizational structure, including by revising its product development process to include regulatory engineering input; and (3) establishment of internal audits to verify compliance with applicable statutory and regulatory requirements. Plaintiffs take no position as to whether in fact these measures have enhanced the statutory or regulatory compliance of Kohler's Engine Division.

The Parties recognize, and the Court by entering this Consent Decree finds, that this Consent Decree has been negotiated by the Parties in good faith and will avoid litigation among the Parties and that this Consent Decree is fair, reasonable, and in the public interest.

**NOW, THEREFORE,** before the taking of any testimony, without the adjudication or admission of any issue of fact or law except as provided in Section I, and with the consent of the Parties, **IT IS HEREBY ADJUDGED, ORDERED, AND DECREED** as follows:

3

1

## I.   JURISDICTION AND VENUE

2   1.   This Court has jurisdiction over the subject matter of this action and the parties

3   pursuant to 28 U.S.C. §§ 1331, 1345, and 1355, and Sections 205(b) and 304 of the Act, 42

4   U.S.C. §§ 7524(b), 7604. This Court has supplemental jurisdiction over the state law claims

5   pursuant to 28 U.S.C. § 1367 because they are part of the same case or controversy as the claims

6   over which the Court has jurisdiction.

7   2.   Venue lies in this District pursuant to Section 205(b) of the Act, 42 U.S.C. §

8   7524(b), and 28 U.S.C. §§ 1391(b) and 1395(a), because some of the acts for which Plaintiffs

9   seek civil penalties occurred in this District.

10   3.   For purposes of this Consent Decree, Defendant consents to the Court's

11   jurisdiction, over any action to enforce this Decree and over Defendant, and consents to venue in

12   this District. Defendant agrees that the Complaint states claims upon which relief may be granted

13   pursuant to Sections 203, 204, 205, and 213(d) of the Act, 42 U.S.C. §§ 7522, 7523, 7524,

14   7547(d), and California Health and Safety Code Sections 43016, 43017, and 43154.

15   ## II.   APPLICABILITY

16   4.   The obligations of this Consent Decree apply to and are binding upon the United

17   States and CARB, and upon Defendant and any successors, assigns, or other entities or persons

18   otherwise bound by law.

19   5.   No transfer of ownership or operation of the Engine Division, whether in

20   compliance with the procedures of this Paragraph or otherwise, shall relieve Defendant of its

21   obligation to ensure that the terms of the Consent Decree are implemented, unless (a) the

22   transferee agrees in writing to undertake the obligations of this Consent Decree and to be

23   substituted for the Defendant as a Party under the Consent Decree and thus be bound by the

24   terms thereof; and (b) the United States and CARB consent in writing to relieve Defendant of its

25   obligations. The United States and CARB may refuse in their unreviewable discretion to consent

4

to the substitution of the transferee for Defendant. At least 30 Days prior to any such transfer, Defendant shall provide a copy of this Consent Decree to the proposed transferee, and shall simultaneously provide written notice of the prospective transfer, together with a copy of the proposed written transfer agreement, to the United States, EPA, the CA AG, and CARB in accordance with Section XIV (Notices). If the United States and CARB each provide written consent pursuant to this Paragraph, such written consent shall be treated as a material modification requiring Court approval pursuant to Section XVII (Modifications). Any attempt to transfer ownership or operation of the Engine Division without complying with this Paragraph is a violation of this Consent Decree.

6.      No transfer of ownership or operation of any entity of Defendant other than the Engine Division, whether in compliance with the procedures of this Section or otherwise, shall relieve Defendant of its obligation to ensure that the terms of the Consent Decree are implemented.

7.      Defendant shall provide a copy of this Consent Decree to all members of its board of directors and to executives, officers, employees, and agents whose duties might reasonably include compliance with any provision of this Decree, as well as to any contractor or auditor retained to perform work required under this Consent Decree. Defendant shall condition any such contract upon performance of the work in conformity with the terms of this Consent Decree. Defendant shall also ensure that any contractors, auditors, agents, and employees whose duties might reasonably include compliance with any provision of the Consent Decree are made aware of those requirements of the Consent Decree relevant to their performance.

8.      In any action to enforce this Consent Decree, Defendant shall not raise as a defense the failure by any of its directors, executives, officers, employees, agents, contractors, or auditors to take any actions necessary to comply with the provisions of this Consent Decree.

1

### III.   DEFINITIONS

2      9.      Terms used in this Consent Decree that are defined in the Act or California Health

3   and Safety Code, or in regulations promulgated pursuant to the Act or the California Health and

4   Safety Code, shall have the meanings assigned to them in those statutes and such regulations,

5   unless otherwise provided in this Consent Decree. Whenever the terms set forth below are used

6   in this Consent Decree, the following definitions shall apply:

7      "ABT" shall refer to the averaging, banking, and trading program codified at 40 C.F.R.

8   Part 1054, Subpart H, and in California, 13 CCR §§ 2401, 2408;

9      "ABT Report" shall mean each report required by 40 C.F.R. Part 1054, Subpart H, and in

10  California, 13 CCR § 2408;

11     "Applicable Requirements" shall mean Sections 203, 204, 205, and 213(d) of the Clean

12  Air Act, 42 U.S.C. §§ 7522, 7523, 7524, 7547(d), and regulations promulgated pursuant to

13  Section 213(a) of the Act, 42 U.S.C. § 7547(a), and codified at 40 C.F.R. Parts 1054, 1065, and

14  1068 as well as California Health and Safety Code Sections 43016, 43017, and 43154, and

15  regulations promulgated pursuant to Sections 39600, 39601, 43013, 43016, 43017, 43101,

16  43102, and 43104 of the California Health and Safety Code and adopted in 13 CCR § 2400 *et

17  seq.*; 13 CCR § 2407 *et seq.*; 13 CCR § 2408 *et seq.*; 13 CCR § 2430 *et seq.*, as applicable to

18  Small SI Engines regulated under 40 C.F.R. Part 1054 and 13 CCR § 2400 *et seq.* and 13 CCR §

19  2430 *et seq.*;

20     "California" means the State of California;

21     "CA AG" shall mean the California Attorney General's Office and any of its successor

22  departments or agencies;

23     "CARB" shall mean the California Air Resources Board;

24

25

1     "Class A Employees" shall mean non-administrative Engine Division personnel in

2   managerial, business development, and sales roles, and any other non-administrative Engine

3   Division personnel who cannot be classified as Class B Employees;

4     "Class B Employees" shall mean non-administrative Engine Division personnel involved

5   in regulatory compliance, operations, or product development (including, but not limited to,

6   personnel in Combustion Engineering or Certification) for Small SI Engines;

7     "Clean Air Act" or "Act" means 42 U.S.C. § 7401-7671q;

8     "Complaint" shall mean the complaint filed by the United States and CARB in this

9   action;

10    "Consent Decree" or "Decree" shall mean this Decree;

11    "Day" shall mean a calendar day unless expressly stated to be a business day. In

12   computing any period of time under this Consent Decree, where the last day would fall on a

13   Saturday, Sunday, or federal or State holiday, the period shall run until the close of business of

14   the next business day;

15    "Defendant" shall mean Kohler Co.;

16    "Deliverable" shall mean any plan, report, or other item that is required to be submitted

17   by Defendant pursuant to this Consent Decree;

18    "Effective Date" shall have the definition provided in Section XV;

19    "Engine Division" shall mean Kohler's business division that develops, certifies,

20   manufactures, and sells Small SI Engines;

21    "EPA" shall mean the United States Environmental Protection Agency and any of its

22   successor departments or agencies;

23    "LSI Engine" or "Off-Road Large Spark-ignition Engine" shall mean any engine that

24   produces a gross horsepower 25 and greater horsepower or is designed (e.g., through fueling,

25   engine calibrations, valve timing, engine speed modifications, etc.) to produce 25 and greater

horsepower (greater than 19 kilowatts on or after January 1, 2007), as specified in 13 CCR § 2431(a)(28).

"Model Year" shall mean the model year as defined in 40 C.F.R. § 1054.801, and in California, 13 CCR §§ 2401(31), 2431(24);

"OTAQ" shall mean EPA's Office of Transportation and Air Quality;

"Paragraph" shall mean a portion of this Decree identified by an arabic numeral;

"Parties" shall mean the United States, CARB, and Defendant;

"Section" shall mean a portion of this Decree identified by a roman numeral;

"SORE Engine" or "Small Off-Road Engine" shall mean any engine that produces a gross horsepower less than 25 horsepower (at or below 19 kilowatts for 2005 and later model year), or is designed (e.g., through fuel feed, valve timing, etc.) to produce less than 25 horsepower (at or below 19 kilowatts for 2005 and later model year), that is not used to propel a licensed on-road motor vehicle, an off-road motorcycle, an all-terrain vehicle, a marine vessel, a snowmobile, a model airplane, a model car, or a model boat, as specified in 13 CCR § 2401(a)(39);

"Small SI Engines" shall mean small, nonroad, nonhandheld spark-ignition engines, which include both SORE Engines and LSI Engines with displacements equal to or less than 1.0 liter under California's regulations, that are subject to Applicable Requirements;

"State" shall mean the State of California;

"United States" shall mean the United States of America, acting on behalf of EPA.

## IV.    CIVIL PENALTY

10.    Within 30 Days after the Effective Date, Defendant shall pay the sum of $20,000,000 as a civil penalty, together with interest accruing from the date on which the Consent Decree is lodged with the Court, at the rate specified in 28 U.S.C. § 1961 as of the date of lodging. The civil penalty shall be split as set forth in Paragraphs 11 and 13 below.

8

11.     Of the sum set forth in Paragraph 10, Defendant shall pay $16,000,000 to the United States by FedWire Electronic Funds Transfer ("EFT") to the U.S. Department of Justice account, in accordance with instructions provided to Defendant by the Financial Litigation Unit ("FLU") of the United States Attorney's Office for the Northern District of California after the Effective Date. The payment instructions provided by the FLU will include a Consolidated Debt Collection System ("CDCS") number, which Defendant shall use to identify all payments required to be made in accordance with this Consent Decree. The FLU will provide the payment instructions to:

> Natalie Maciolek
> VP - General Counsel and Corporate Secretary
> Kohler Co.
> 444 Highland Dr.
> Kohler, WI 53044
> (920) 457-4441
> Natalie.Maciolek@kohler.com

on behalf of Defendant. Defendant may change the individual to receive payment instructions on its behalf by providing written notice of such change to the United States and EPA in accordance with Section XIV (Notices).

12.     At the time of payment, Defendant shall send notice that payment has been made: (i) to EPA via email at cinwd_acctsreceivable@epa.gov or via regular mail at EPA Cincinnati Finance Office, 26 W. Martin Luther King Drive, Cincinnati, Ohio 45268; and (ii) to the United States and EPA via email or regular mail in accordance with Section XIV. Such notice shall state that the payment is for the civil penalty owed pursuant to the Consent Decree in *United States and CARB v. Kohler Co.*, and shall reference the civil action number, CDCS Number and DOJ case number 90-5-2-1-11892.

13.     Of the amount set forth in Paragraph 10, Defendant shall pay to CARB $4,000,000. Payment shall be made by check accompanied by a Payment Transmittal Form

provided by CARB to the addressee listed in Paragraph 11 after the Effective Date, with each

check mailed to:

California Air Resources Board
Accounting Branch
P.O. Box 1436
Sacramento, CA 95812-1436

or by electronic wire transferred to:

State of California Air Resources Board
c/o Bank of America, Inter Branch to 0148
Routing No. 0260-0959-3 Account No. 01482-80005
Notice of Transfer: Edna Murphy, Fax: (916) 322-9612
Reference: CARB Case Nos. C00029

If paid by wire transfer, Defendant shall be solely responsible for any wire transfer fees. All

penalties paid shall be deposited by CARB into the Air Pollution Control Fund, and used by

CARB to carry out its duties and functions.

14.     Defendant shall not deduct any penalties paid under this Consent Decree pursuant

to this Section, or Section VIII (Stipulated Penalties), in calculating and submitting its federal,

state, or local income tax.

15.     The payment of stipulated penalties and interest, if any, shall not alter in any way

Defendant's obligation to complete performance of the requirements of this Consent Decree.

## V.     COMPLIANCE MEASURES

16.     <u>Corporate Compliance</u>. Within 60 Days of the Effective Date, Defendant shall

implement and maintain the following policies and practices:

a.     <u>Code of Conduct</u>. Defendant represents that it has corporate global

policies that require employees to report to their management all violations of law, regulations,

or company policy. Defendant shall conduct annual training related to these policies for all

Engine Division managers, Class A Employees, and Class B Employees. Defendant shall require

all such employees to certify annually that they have reviewed and understand these policies.

10

b.   <u>Ethics Helpline</u>. Defendant represents that it has a whistleblower system known as the Ethics Helpline that includes, among other things, elements (1) through (5) identified in this subparagraph 16.b, and shall within 60 Days of the Effective Date implement element (6) below. Defendant may, in its discretion, contract with a third party to implement the Ethics Helpline.

(1)   Defendant retains professionally educated and trained employees to administer the Ethics Helpline;

(2)   Defendant provides a means for all Engine Division employees to report possible violations of Applicable Requirements;

(3)   Defendant conducts mandatory annual ethics training, which includes how to make reports to the Ethics Helpline, for all Engine Division managers, Class A Employees, and Class B employees;

(4)   Defendant has a system for investigation and resolution of Ethics Helpline complaints relating to compliance with Applicable Requirements;

(5)   Defendant provides a mechanism for tracking Ethics Helpline complaints and resolutions relating to compliance with Applicable Requirements; and

(6)   Defendant provides for reporting of Ethics Helpline complaints and resolutions relating to compliance with Applicable Requirements or this Consent Decree to EPA and CARB pursuant to Section VII (Reporting Requirements).

17.   <u>Management and Certification Improvements</u>. Defendant shall:

a.   <u>Incorporate Environmental Compliance Into Job Descriptions</u>. No later than 60 Days from the Effective Date, add environmental compliance requirements to personnel job descriptions for all members of the Environmental Regulatory Compliance Team established in subparagraph 17.b, and all Class A Employees and Class B Employees.

b.   <u>Environmental Regulatory Compliance Team</u>. No later than 60 Days from

11

the Effective Date, prepare and provide to EPA and CARB for review and approval in accordance with Paragraphs 21-24 (Approval of Deliverables) a written organizational and implementation plan (the "ERC Plan") for the establishment of an Environmental Regulatory Compliance Team ("Compliance Team"). The ERC Plan shall provide that:

(1)     the Compliance Team operates independently from product engineering, sales, and marketing functions, with the understanding that the Senior Manager for Global Certification may serve on the Compliance Team, but may not be designated to lead the Compliance Team pursuant to Paragraph 17.b(6) below;

(2)     the Compliance Team shall be accountable for compliance with Applicable Requirements and this Consent Decree;

(3)     the Compliance Team shall be staffed with experts in compliance with Applicable Requirements;

(4)     at least annually, the Compliance Team shall review and as necessary revise all internal policies, test procedures, standard operating procedures, and work instructions of the Engine Division to ensure compliance with Applicable Requirements and this Consent Decree;

(5)     the Compliance Team shall monitor and understand developments in engine and emissions regulations and changes to Applicable Requirements, and define the tasks, authorities, and responsibilities of managers involved in product development and certification with respect to compliance with Applicable Requirements;

(6)     Defendant shall designate one member of the Compliance Team to lead the Compliance Team, who shall have ultimate responsibility for compliance with Applicable Requirements and this Consent Decree, and decisions pertaining to certification, operations, and product development that relate to or affect compliance with Applicable Requirements and this Consent Decree;

12

(7)     Compliance Team members shall be integrated into certification, product engineering, operations, and sales and marketing within the Engine Division, such that Compliance Team members can provide regulatory input during all stages of product development and certification;

(8)     the Compliance Team shall implement enhanced certification processes to ensure compliance with Applicable Requirements; and

(9)     the designated leader of the Compliance Team shall prepare an annual report (the "ERC Annual Report"), which shall be distributed to the President of the Engine Division, the head of engineering for the Engine Division, and the General Counsel and his or her designee within the General Counsel's office, documenting compliance with the requirements of the ERC Plan.

c.     <u>Semiannual Meetings</u>. Defendant shall conduct semiannual meetings regarding compliance with Applicable Requirements and this Consent Decree for all Engine Division managers and regulatory personnel, including but not limited to Class B Employees. Such meetings shall be chaired by the head of the Compliance Team established in Paragraph 17.b, who shall set the agenda for each such meeting, and who shall include the agenda and a summary of the meeting in the ERC Annual Report.

18.     <u>Training</u>. No later than 90 Days after the Effective Date, and annually thereafter, Defendant shall provide training on Applicable Requirements and this Consent Decree as follows:

a.     For all Class A Employees, Defendant shall conduct training that includes:

(1)     An overview of Kohler's engine certification program;

(2)     An overview of the Applicable Requirements, including the requirement that all Small SI Engines introduced into commerce be covered by a valid Certificate of Conformity and (for engines to be introduced into California) Executive Order;

13

(3)      An explanation and discussion of the prohibition against the use of defeat devices in Title II of the Clean Air Act, and implementing regulations, and Division 26, Part 5 of the California Health and Safety Code, and implementing regulations;

(4)      An explanation and discussion of civil and criminal liability for violations of Title II of the Clean Air Act, and implementing regulations, and Division 26, Part 5 of the California Health and Safety Code, and implementing regulations, including options for employees to raise compliance concerns directly with government authorities;

(5)      An explanation and discussion of Defendant's obligations under the Consent Decree and penalties for noncompliance; and

(6)      An explanation and discussion of the Code of Conduct and Ethics Helpline maintained under Paragraphs 16.a and 16.b.

b.      For all Class B Employees, Defendant shall conduct training that addresses all of the above topics as well as the following topics:

(1)      The regulatory requirements governing test cycle selection and Kohler's internal procedure for complying with the same;

(2)      The 40 C.F.R. Part 1065 testing requirements;

(3)      The process and regulatory requirements associated with establishing deterioration factors, along with the requirement to age emission-related components;

(4)      Elements of design that can affect emissions, including but not limited to fueling strategies, engine speed, engine power, engine design, and calibration (spark timing, standard and alternative air-fuel ratio maps, performance enhancement strategies, etc.);

(5)      AECDs and adjustable parameters, along with the requirement to disclose AECDs and adjustable parameters in certification applications;

(6)      The requirement to amend certification applications when making

14

certain changes to production engines, as well as Kohler's internal procedure for complying with same;

(7)     PLT requirements, including how to calculate the minimum number of engines to test and when to exclude initial or subsequent tests in the PLT averaging calculations, along with Kohler's internal procedure for complying with the same;

(8)     The requirement to submit complete and accurate certification applications, ABT reports, and PLT reports; and

(9)     The applicable evaporative emissions requirements.

c.     Defendant shall develop a system to track training required under this Paragraph 18 that is completed by employees and develop post-training testing to evaluate employees' knowledge of the information included in the training.

d.     Defendant shall train all new Class A and Class B Employees hired after the Effective Date within 30 Days of starting employment in accordance with Paragraph 18. All such employees shall be prohibited from work on certification or emissions-testing matters until completing the training.

19.     Emissions Testing Validation.

a.     The ETV Plan. To confirm the validity and accuracy of Defendant's emission testing program, Defendant shall submit to EPA and CARB within 60 Days of the Effective Date, an Emissions Testing Validation plan (the "ETV Plan") for review and approval in accordance with Paragraphs 21-24 (Approval of Deliverables). The Plan shall have three components, as further described in subsequent subparts of this Paragraph: (i) a plan for the auditing of Kohler's internal emissions testing laboratory to ensure compliance with Applicable Requirements (the "Lab Audit Component"); (ii) a plan for third-party observation and verification of specified emissions testing conducted by Kohler at its internal emissions testing laboratory (the "Kohler Lab Observation Component"); and (iii) a plan for third-party

15

1   confirmation emissions testing of select engines at a third-party laboratory (the "Outside Lab

2   Component").

3              b.      The Lab Audit Component. The Lab Audit Component shall provide for

4   three annual internal or external audits of Defendant's emissions testing labs, procedures,

5   equipment, recordkeeping, and reporting. The first audit shall take place during 2020 and shall

6   be completed by September 30, 2020. The second audit shall take place during 2021 and shall be

7   completed by September 30, 2021. The third audit shall take place during 2022 and shall be

8   completed by September 30, 2022. These audits may be combined with the annual compliance

9   audits required under Paragraph 20. The Lab Audit Component shall specify who within

10  Defendant's organization will conduct the audit and how it will be conducted. Defendant shall

11  require the auditor to prepare a report of each annual audit within 45 Days after completion of an

12  audit, and submitted to EPA and CARB no later than November 15 in 2020, 2021, and 2022, as

13  applicable, describing the procedures, processes, or methodologies used to conduct the audit; the

14  labs, procedures, equipment, recordkeeping, and reporting reviewed during the audit; and the

15  findings and recommendations of the auditor. Within 60 Days after submission of the auditor's

16  report, Defendant shall submit to EPA and CARB for review and approval a written response to

17  the findings and recommendations, and an action plan for expeditiously addressing or responding

18  to each finding and recommendation in the auditor's report ("Lab Audit Action Plan"). The Lab

19  Audit Action Plan shall include a schedule that is as expeditious as practicable of the steps that

20  will be taken by Defendant to achieve full compliance with Applicable Requirements pertaining

21  to laboratory compliance.

22              c.      The Kohler Lab Component.  The Kohler Lab Component shall provide

23  for a third party to observe specified periods of certification or production line emissions testing

24  undertaken at Kohler's laboratory for three years, calendar years 2020, 2021, and 2022.

25                       (1)      The Kohler Lab Component shall include a written statement of (a)

the qualifications for its proposed third-party observer (the "Independent Observer") including its name, affiliation, address, and experience in conducting emissions testing for Small SI Engines; (b) a description of previous contracts or financial relationships of the proposed observer with Defendant; and (c) a description of how Defendant proposes the Independent Observer will perform its responsibilities, including how frequently the Independent Observer will be present during emissions testing, how the specific times of observation will be determined, and how the observations will take place.

(2)      The Kohler Lab Component shall provide that the Independent Observer (i) will be present for at least two weeks and witness, in the Independent Observer's judgment, the relevant portions of a total of at least 15 emissions tests involving engines in at least five different engine families, including at least one EFI and one carbureted engine, and including emission tests showing compliance with the adjustable parameter set in multiple positions (i.e., multiple emissions tests on an engine with adjustable parameters) on at least one engine from each of the five engine families as selected by the Independent Observer, in each of calendar years 2020, 2021, and 2022, and (ii) will visit at least once between January 1 through June 30, and once between July 1 and December 31, with the visits being at least one month apart.

(3)      The selection of the Independent Observer shall be subject to EPA and CARB approval.

(4)      The Independent Observer will report in writing to Kohler, EPA, and CARB any noncompliance with emissions testing provisions of the Applicable Requirements and this Consent Decree within 21 Days of identification, and will make recommendations on how to address any such noncompliance. Such report shall be submitted even if the Independent Observer has not completed its observation activities for the year, in which case, it shall continue and complete its observation activities and submit such additional

17

1    reports as are warranted.

2              (5)      The Independent Observer shall prepare an annual report of all

3    observation conducted that calendar year, to be submitted to Defendant, EPA, and CARB no

4    later than 60 Days after the testing for the year specified in Paragraph 19(c)(2) is complete ,

5    setting forth all findings and recommendations and any data supporting those findings and

6    recommendations.

7              (6)      Within 30 Days after submission of the Independent Observer's

8    report, Defendant shall submit to EPA and CARB for review and approval a written response to

9    the findings and recommendations in the report, and an action plan ("Independent Observer

10   Action Plan") for expeditiously addressing or responding to each finding and recommendation in

11   the report. The Independent Observer Action Plan shall include a schedule that is as expeditious

12   as practicable of the steps that will be taken by Defendant to achieve full compliance with

13   Applicable Requirements.

14             d.      The Outside Lab Component.  Defendant shall conduct third-party

15   confirmation testing of up to 10 Small SI Engines per Model Year, to be selected jointly by EPA

16   and CARB. The third-party emissions tester ("Third-Party Emissions Tester") shall select the test

17   article(s) from Defendant's facility and then conduct low-hour exhaust emissions and break-in

18   testing. The Outside Lab Component shall include: (i) a written statement of qualifications for its

19   proposed independent Third-Party Emissions Tester, including its name, affiliation, address, and

20   experience in conducting emissions testing for Small SI engines; (ii) a description of previous

21   contracts or financial relationships of the proposed Third-Party Emissions Tester with

22   Defendant; (iii) a list of all emissions and engine parameters that will be measured and recorded

23   during each test performed under this Paragraph; (iv) a description of the test methods and

24   supporting data Defendant proposes to use; and (v) a template for Defendant's summary report

25   as described below.

(1)     Within 30 Days of approval of the ETV Plan under Paragraph 19.a,
Defendant shall retain a Third-Party Emissions Tester. No attorney-client relationship shall exist
or be formed between Defendant and the Third-Party Emissions Tester. Defendant shall ensure
that the Third-Party Emissions Tester conducts testing as set forth in the Outside Lab
Component.

(2)     For each of Model Years 2020, 2021, and 2022, Defendant shall
ensure that the Third-Party Emissions Tester prepares, within 60 Days after the testing for the
year is complete, a report ("Third-Party Emissions Tester Summary Report") which shall include
an executive summary of the data and methods for all testing the Third-Party Emissions Tester
performed under this subparagraph 19.d for that Model Year, a description of the test facilities
and test equipment/specifications, photographs of the test article on the test stand, a description
of the testing performed (including emission test cycle) and the test results for each test run, a
description of any adjustable parameters on the engine, a power curve for the engine tested,
detailed test results data sheets, inspection information and photographs, and a test fuel report.
Any deviations from normal test protocols shall be clearly recorded and explained in the official
test report. The report shall also include a statement that the instrumentation used and the
subsequent emission testing met all Applicable Requirements. The test results information shall
be provided in a format that demonstrates whether an engine meets the applicable emission
standards. The test results information shall include basic information about the test article, test
fuel, test cell, test cycle data by mode, emissions measurements by mode, and final calculated
emission levels. The deterioration factors for the engine and the final deteriorated test results
shall also be included.

(3)     To the extent the test results show an exceedance of any applicable
emissions standards, Defendant shall conduct a root cause analysis for such deviations, and,
within 60 Days of the submission of the Third-Party Emissions Tester Summary Report, submit

19

to EPA and CARB for review and approval a written report describing any root causes identified for the exceedance, whether the exceedance resulted from any noncompliance with Applicable Requirements by Kohler, and, if they did, an action plan ("Emissions Exceedance Action Plan") for expeditiously addressing such noncompliance and achieving full compliance with Applicable Requirements. The Emissions Exceedance Action Plan shall include a schedule that is as expeditious as practicable of the steps that will be taken for Defendant to achieve full compliance with Applicable Requirements.

20.     Annual Compliance Audits. Defendant shall conduct three annual compliance audits, as follows:

a.     Compliance Audit Plan. Within 60 Days of the Effective Date, Defendant shall submit for review and approval in accordance with Paragraphs 21-24 (Approval of Deliverables) a plan for an annual assessment of compliance with Applicable Requirements. Such Compliance Audit Plan shall include:

(1)     a list of Applicable Requirements;

(2)     procedures for the exchange of any documents or information that the Auditor needs to perform its duties;

(3)     a list of the internal policies, test procedures, standard operating procedures, and work instructions to be audited annually;

(4)     a list of all testing and data that will be reviewed during each annual audit;

(5)     a statement of qualifications of the Compliance Auditor;

(6)     a list of all steps the Compliance Auditor will perform during each annual compliance audit;

(7)     a proposed timeline for performance of each of the steps identified in a compliance audit; and

20

(8)      a template for the Annual Compliance Audit Report as described below.

b.      <u>Compliance Auditor</u>. Within 30 Days of approval of the Compliance Audit Plan, Defendant shall appoint a Compliance Auditor to conduct audits pursuant to the Compliance Audit Plan. Defendant may, but is not required to, hire a third party to serve as Compliance Auditor. Defendant shall ensure that the Compliance Auditor meets the qualifications described in the Compliance Audit Plan and conducts the audits as set forth in the Audit Plan, and in accordance with the following requirements:

(1)      <u>Duties</u>. The Compliance Auditor shall provide objective and fair assessments of Defendant's compliance with Applicable Requirements and with the requirements of this Consent Decree. The duties of the Compliance Auditor shall be carried out based on:

(a)      review of relevant documents and procedures;

(b)      on-site observation of selected systems and procedures, including internal controls, recordkeeping, and internal audit procedures;

(c)      meetings and interviews;

(d)      analyses and studies of Defendant's compliance program and associated processes;

(e)      other reasonable audit procedures;

(f)      the reports due under this Consent Decree, including the Lab Audit, Independent Observer, and any Emissions Exceedance Action Plans, to the extent any such reports have been submitted in accordance with this Consent Decree during the calendar year for which the audit is being conducted; and

(g)      such other information as may be necessary to verify compliance with Applicable Requirements and with this Consent Decree.

21

(2)      <u>Cooperation</u>. The Compliance Auditor shall have the authority to take all steps necessary to become fully informed of Defendant's compliance with Applicable Requirements. The Compliance Auditor shall have full access to the facilities, documents, employees, and information required to fulfill the duties listed in this Paragraph 20. In the event that Defendant elects to retain a third-party Compliance Auditor for purposes of this Paragraph and thereafter seeks to withhold from the Compliance Auditor access to information, documents, records, facilities, or current or former employees or contractors of the Defendant that may be subject to a claim of attorney-client privilege or to the attorney work product doctrine, or where the Defendant reasonably believes production or providing access would otherwise be inconsistent with applicable law, the Defendant shall work cooperatively with the Compliance Auditor to resolve the matter to the satisfaction of the Compliance Auditor consistent with applicable law and Paragraph 67 of this Consent Decree. If the Compliance Auditor believes Defendant has violated the requirements of this Paragraph with regard to providing access to facilities, documents, employees, and information, the Compliance Auditor shall promptly notify the United States, EPA, the CA AG, and CARB, and the notice shall include a description of the alleged violations and supporting documentation as necessary;

(3)      <u>Waiver</u>. Defendant shall not assert that communications with the Compliance Auditor are in any way privileged or that the work of the Compliance Auditor is protected from disclosure by the attorney work product doctrine; and

(4)      <u>Removal</u>. Defendant may only replace the Compliance Auditor for good cause shown and with the prior written consent of EPA and CARB. Such consent shall not be unreasonably withheld.

c.      <u>Annual Compliance Audit Report</u>. Defendant shall require the Compliance Auditor to prepare and Defendant shall submit a report ("Annual Compliance Audit Report") to EPA and CARB for review and approval. The Annual Compliance Audit Report shall contain:

(1) a detailed description of all work performed to conduct the annual audit;

(2) an executive summary of findings, conclusions, and action items;

(3) a detailed discussion of findings;

(4) a detailed discussion of conclusions;

(5) a list of action items and recommendations for Defendant to take or that Defendant has taken to achieve compliance with Applicable Requirements and this Consent Decree; and

(6) all data necessary for EPA and CARB to evaluate the findings and recommendations in the Annual Compliance Audit Report.

d.      Due Dates. The first Annual Compliance Audit Report shall address Defendant's compliance during calendar year 2019 and shall be due by September 30, 2020. Subsequent Annual Compliance Audit Reports shall address calendar years 2020 and 2021, and shall be due by June 30 of the calendar year following the year for which the audit was conducted.

e.      Audit Action Plans. Within 60 Days after submission of the Annual Compliance Audit Report to EPA and CARB, Defendant shall submit to EPA and CARB for review and approval a written response to the Annual Compliance Audit Report findings and recommendations, and an action plan ("Audit Action Plan") for expeditiously addressing the findings and recommendations in the Annual Compliance Audit Report. The Audit Action Plan shall include a schedule that is as expeditious as practicable.

f.      Certification of Audit Action Plan Implementation. By no later than 30 Days after completion of the implementation of all actions, if any, required by an Audit Action Plan, Defendant shall submit a report to EPA and CARB certifying that Defendant has implemented the requirements of the Audit Action Plan and is in compliance with Applicable

23

1  Requirements and this Consent Decree.

2        21.   <u>Approval of Deliverables</u>. After review of any Deliverable that is required to be

3  submitted for approval pursuant to Paragraphs 17.b (ERC Plan), 19.a (ETV Plan), 19.b (Lab

4  Audit Action Plans), 19.c(3) (Selection of Independent Observer), 19.c(6) (Independent Observer

5  Action Plan), 19.d(3) (Emissions Exceedance Action Plan), 20.a (Compliance Audit Plan),

6  20.b(4) (Removal of Compliance Auditor), 20.c (Annual Compliance Audit Report), and 20.e

7  (Audit Action Plans) of this Consent Decree, EPA and CARB shall in writing:

8            a.    approve the submission,

9            b.    approve the submission upon specified conditions,

10            c.    approve part of the submission and disapprove the remainder, or

11            d.    disapprove the submission.

12        22.   If the Deliverable is approved pursuant to Paragraph 21, Defendant shall take all

13  actions required by the Deliverable, in accordance with the schedules and requirements of the

14  Deliverable, as approved. If the Deliverable is conditionally approved or approved only in part

15  pursuant to Paragraph 21.b or 21.c, Defendant shall, upon written direction, take all actions

16  required by the approved plan, report, or other item that EPA and/or CARB determine are

17  technically severable from any disapproved portions, subject to Defendant's right to dispute only

18  the specified conditions or the disapproved portions, under Section X (Dispute Resolution).

19        23.   If the Deliverable is disapproved in whole or in part pursuant to Paragraph 21.c or

20  21.d, Defendant shall, within 45 Days or such other time as the Parties agree to in writing,

21  correct all deficiencies and resubmit the plan, report, or other item, or disapproved portion

22  thereof, for approval, in accordance with the preceding Paragraphs. If the resubmitted

23  Deliverable is approved in whole or in part, Defendant shall proceed in accordance with the

24  preceding Paragraph.

25

24.     If a resubmitted Deliverable is disapproved in whole or in part, EPA and/or CARB may again require Defendant to correct any deficiencies, in accordance with the preceding Paragraphs, or may itself correct any deficiency subject to Defendant's right to invoke Dispute Resolution and the right of Plaintiffs to seek stipulated penalties as provided in the following Paragraphs.

25.     Any stipulated penalties applicable to submission of the original Deliverable, as provided in Section VIII, shall accrue during the 45-Day period or other specified period, but shall not be payable unless the resubmitted Deliverable is untimely or is disapproved in whole or in part; provided that, if the original submission was so deficient as to constitute a material breach of Defendant's obligations under this Consent Decree, the stipulated penalties applicable to the original Deliverable shall be due and payable notwithstanding any subsequent resubmission.

## VI.     CORRECTION OF ABT REPORTS

26.     <u>EPA ABT Credit Forfeiture</u>. Defendant shall correct its EPA hydrocarbon plus nitrogen oxides ("HC + NOx") credits as follows. Within 45 Days of the Effective Date, or within 45 Days of when OTAQ provides processing instructions by Model Year and engine family, whichever is later, and in accordance with those processing instructions, Defendant shall amend its Model Year 2011-2016 ABT reports such that Defendant's resulting credit balance is 3,062,090 kg of credits less than would be the balance if calculated using the HC + NOx emission data Defendant originally submitted in its original end-of-year ABT reports for these Model Years. The credit adjustments shall be permanent.

27.     <u>CARB ABT Credit Forfeiture</u>. Defendant shall correct its CARB HC + NOx emissions credits as follows. Within 45 Days of the Effective Date, or within 45 Days of when CARB provides processing instructions, whichever is later, and in accordance with those processing instructions by Model Year and engine family, Defendant shall amend its Model Year 2011-2016

25

ABT reports such that Defendant's resulting credit balance is 271,834.720 kg of credits less than would be the balance if calculated using the HC + NOx emission data Defendant originally submitted in its original end-of-year ABT reports for these Model Years. The credit adjustments shall be permanent.

28.     Within 60 Days of the Effective Date, or within 60 Days after OTAQ and CARB provide credit processing instructions, whichever is later, Defendant shall provide written notice to EPA and CARB that it has complied with this Section by sending a Notice in accordance with Section XV of this Consent Decree (Notices).

### VII.     REPORTING REQUIREMENTS

29.     Defendant shall submit the following reports:

a.     <u>Semi-Annual Compliance Reports</u>. By July 31st and January 31st of each year after the lodging of this Consent Decree, until termination of this Consent Decree pursuant to Section XVIII, Defendant shall electronically submit a semi-annual report with a certification in accordance with Paragraph 32 for the preceding six months (or, in the case of the initial semi-annual report, for the period from the Effective Date through either June 30th or December 31st, whichever is appropriate) that shall include:

(1)     A description of all work performed under the Consent Decree since the last Semi-Annual Compliance Report was submitted;

(2)     A list of all reports and action plans submitted during that period under Sections V and VII of this Consent Decree;

(3)     A description of any Ethics Helpline complaints relating to compliance with Applicable Requirements or this Consent Decree and their resolution;

(4)     The ERC Annual Report required by Paragraph 17.b(9);

(5)     Third-Party Emissions Tester Summary Reports prepared in accordance with Paragraph 19.d(2);

(6)       Problems encountered or anticipated, together with implemented or proposed solutions; and

(7)       An accounting of all stipulated penalties assessed and paid pursuant to Section VIII.

b.      Initial Semi-Annual Compliance Report. In addition to the items in the preceding Paragraph 29.a, the initial semi-annual report shall include:

(1)       Evidence of Defendant's payment of civil penalties pursuant to Section IV (Civil Penalty);

(2)       Evidence of Defendant's correction of ABT reports pursuant to Section VI (Correction of ABT Reports);

(3)       Examples of descriptions of environmental compliance requirements to be included in personnel job descriptions pursuant to Paragraph 17.a; and

(4)       All training materials developed by Defendant pursuant to Paragraph 18.

c.      Reporting of Violations. Each of the Semi-Annual Compliance Reports submitted pursuant to Paragraph 29.a above shall also include a description of any noncompliance with the requirements of this Consent Decree and an explanation of the violation's likely cause and of the remedial steps taken, or to be taken, to prevent or minimize such violation. If Defendant violates, or has reason to believe that it may violate, any requirement of this Consent Decree, Defendant also shall notify the United States, EPA, and CARB in writing of such violation within 14 Days of the Day Defendant first becomes aware that a violation has occurred or may occur. Such notice shall include the date of the violation, a description of the violation, its likely duration, and an explanation of the violation's likely cause and of the remedial steps taken, or to be taken, to prevent or minimize such violation. If the cause of a violation cannot be fully investigated and explained at the time the notice is due,

27

Defendant shall so state. Defendant shall then complete its investigation of the cause of the violation and submit a written report, including a full explanation of the cause of the violation, within 30 Days of the Day Defendant becomes aware of the cause of the violation. Nothing in this Paragraph or the following Paragraph relieves Defendant of its obligation to provide the notice required by Section IX (Force Majeure).

30.    Whenever any violation of this Consent Decree or any other event affecting Defendant's performance under this Decree may pose an immediate threat to the public health or welfare or the environment, Defendant shall notify EPA, the CA AG, and CARB by electronic or facsimile transmission as soon as possible, but no later than 24 hours after Defendant first becomes aware of the violation or event. This procedure is in addition to the requirements set forth in the preceding Paragraph.

31.    All reports, including action plans, shall be submitted to all persons designated in Section XIV (Notices).

32.    Each report, including action plans, submitted by Defendant under this Section shall be signed by an official of the submitting party and include the following certification:

I certify under penalty of law that this document and all attachments were prepared under my direction or supervision in accordance with a system designed to assure that qualified personnel properly gather and evaluate the information submitted. Based on my inquiry of the person or persons who manage the system, or those persons directly responsible for gathering the information, the information submitted is, to the best of my knowledge and belief, true, accurate, and complete. I have no personal knowledge or belief that the information submitted is other than true, accurate, and complete. I am aware that there are significant penalties for submitting false information, including the possibility of fine and imprisonment for knowing violations.

28

33.     This certification requirement does not apply to emergency or similar notifications where compliance would be impractical.

34.     The reporting requirements of this Consent Decree do not relieve Defendant of any reporting obligations required by the Act, the California Health and Safety Code, or their implementing regulations, or by any other federal, state, or local law, regulation, permit, or other requirement.

35.     Any information provided pursuant to this Consent Decree may be used by the United States and CARB in any proceeding to enforce the provisions of this Consent Decree and as otherwise permitted by law.

36.     Defendant may assert that information submitted under this Consent Decree is protected as Confidential Business Information ("CBI") as set out in 40 C.F.R. Part 2 or 17 CCR §§ 91000 to 91022.

## VIII.   STIPULATED PENALTIES

37.     Defendant shall be liable for stipulated penalties to the United States and CARB for violations of this Consent Decree as specified below, unless excused under Section IX (Force Majeure). A violation includes failing to perform any obligation required by the terms of this Decree, including any work plan or schedule approved under this Decree, according to all applicable requirements of this Decree and within the specified time schedules established by or approved under this Decree.

38.     <u>Late Payment of Civil Penalty</u>. If Defendant fails to pay the civil penalty required to be paid under Section IV (Civil Penalty) when due, Defendant shall pay a stipulated penalty of $5,000 per Day for each Day that the payment is late.

39.     <u>Failure to Timely Perform Compliance Obligations</u>.

        a.      The following stipulated penalties shall accrue per violation per Day for each violation of the requirements identified in subparagraph 39.b:

29

<u>Penalty Per Violation Per Day</u> .........................<u>Period of Noncompliance</u>

$2,500 ..................................................1st through 14th Day

$5,000 ............................................... 15th through 30th Day

$7,500 .................................................31st Day and beyond

   b.  The following compliance obligations shall be subject to stipulated penalties under this Paragraph:

     (1)  Establishment of the Environmental Regulatory Compliance Team required by Paragraph 17.b;

     (2)  Conducting the training required by Paragraphs 16.a, 16.b(3), and 18, provided that these penalties shall only accrue after EPA or CARB has reviewed the information provided pursuant to Paragraph 29.b(4), notified Defendant of any deficiencies in writing, and Defendant has had 45 Days to correct any such deficiencies;

     (3)  Submission and implementation of the Emissions Testing Validation Plan required by Paragraph 19;

     (4)  Conducting the annual compliance audits required by Paragraph 20;

     (5)  Implementation of any Audit Action Plan developed pursuant to Paragraph 20.e;

     (6)  Correction of ABT reports pursuant to Section VI (Correction of ABT Reports); and

     (7)  Adhering to the certification requirement of Paragraph 32.

   40. <u>Reporting Requirements</u>. The following stipulated penalties shall accrue per violation per Day for each violation of the reporting requirements of this Consent Decree, except to the extent such reporting requirements are subject to stipulated penalties under the preceding Paragraph:

Penalty Per Violation Per Day ......................... Period of Noncompliance

$1,000 .................................................. 1st through 30th Day

$2,000 .................................................. 31st Day and beyond

41.     Stipulated penalties under this Section shall begin to accrue on the Day after performance is due or on the Day a violation occurs, whichever is applicable, and shall continue to accrue until performance is satisfactorily completed or until the violation ceases. Stipulated penalties shall accrue simultaneously for separate violations of this Consent Decree.

42.     Defendant shall pay stipulated penalties to the United States and CARB within 30 Days of a written demand by either Plaintiff. Defendant shall pay 80 percent of the total stipulated penalty amount due to the United States and 20 percent to CARB. The Plaintiff making a demand for payment of a stipulated penalty shall simultaneously send a copy of the demand to the other Plaintiff.

43.      Either Plaintiff may, in the unreviewable exercise of its discretion, reduce or waive stipulated penalties otherwise due it under this Consent Decree. However, no action by either Plaintiff may reduce or waive stipulated penalties due to the other.

44.     Stipulated penalties shall continue to accrue as provided in Paragraph 41 during any Dispute Resolution, but need not be paid until the following:

a.      If the dispute is resolved by agreement of the Parties or by a decision of EPA or CARB that is not appealed to the Court, Defendant shall pay accrued penalties demanded, together with interest, to the United States and/or CARB within 30 Days of the effective date of the agreement or the receipt of EPA's or CARB's decision or order.

b.      If the dispute is appealed to the Court and the United States and/or CARB prevails in whole or in part, Defendant shall pay all accrued penalties determined by the Court to be owing, together with interest, within 60 Days of receiving the Court's decision or order, except as provided in subparagraph 44.c, below.

31

c.      If any Party appeals the District Court's decision, Defendant shall pay all accrued penalties determined to be owing, together with interest, within 15 Days of receiving the final appellate court decision.

45.     Defendant shall pay stipulated penalties owing to the United States in the manner set forth and with the confirmation notices required by Paragraph 11, except that the transmittal letter shall state that the payment is for stipulated penalties and shall state for which violation(s) the penalties are being paid.

46.     Defendant shall pay stipulated penalties owing to CARB by check accompanied by a Payment Transmittal Form provided by CARB pursuant to Section XIV (Notices) after the Effective Date, with each check mailed to:

> California Air Resources Board
> Accounting Branch
> P.O. Box 1436
> Sacramento, CA 95812-1436

or by wire transfer, in which case Defendant shall use the following wire transfer information and send the Payment Transmittal Form to the above address prior to each wire transfer:

> State of California Air Resources Board
> c/o Bank of America, Inter Branch to 0148
> Routing No. 0260-0959-3 Account No. 01482-80005
> Notice of Transfer: Edna Murphy, Fax: (916) 322-9612
> Reference: Case Nos. C00029

Defendant is directly responsible for any fees associated with the wire transfer. Stipulated penalties paid to CARB shall be deposited into the Air Pollution Control Fund and used by CARB to carry out its duties and functions.

47.     If Defendant fails to pay stipulated penalties according to the terms of this Consent Decree, Defendant shall be liable for interest on such penalties, as provided for in 28 U.S.C. § 1961, accruing as of the date payment became due. Nothing in this Paragraph 1

be construed to limit the United States or CARB from seeking any remedy otherwise provided by law for Defendant's failure to pay any stipulated penalties.

48.    The payment of penalties and interest, if any, shall not alter in any way Defendant's obligation to complete performance of the requirements of this Consent Decree.

49.    <u>Non-Exclusivity of Remedy</u>. Stipulated penalties are not the United States' or CARB's exclusive remedy for violations of this Consent Decree. Subject to the provisions of Section XII (Effect of Settlement/Reservation of Rights), the United States and CARB each expressly and separately reserve the right to seek any other relief it deems appropriate for Defendant's violation of this Consent Decree or applicable law, including but not limited to an action against Defendant for statutory penalties, additional injunctive relief, mitigation or offset measures, and/or contempt. However, the amount of any statutory penalty assessed for a violation of this Consent Decree shall be reduced by an amount equal to the amount of any stipulated penalty assessed and paid pursuant to this Consent Decree for the same violation.

## IX.    FORCE MAJEURE

50.    "Force majeure," for purposes of this Consent Decree, is defined as any event arising from causes beyond the control of Defendant, of any entity controlled by Defendant, or of Defendant's contractors, which delays or prevents the performance of any obligation under this Consent Decree despite Defendant's best efforts to fulfill the obligation. The requirement that Defendant exercise "best efforts to fulfill the obligation" includes using best efforts to anticipate any potential force majeure event and best efforts to address the effects of any potential force majeure event (a) as it is occurring and (b) following the potential force majeure, such that the delay and any adverse effects of the delay are minimized. "Force Majeure" does not include Defendant's financial inability to perform any obligation under this Consent Decree.

51.    If any event occurs or has occurred that may delay the performance of any obligation under this Consent Decree, whether or not caused by a force majeure event, Defendant

33

shall provide notice to the United States, EPA, the CA AG, and CARB by electronic or facsimile transmission pursuant to Section XIV (Notices), within 5 Days of when Defendant first knew that the event might cause a delay. Within 14 Days thereafter, Defendant shall provide in writing to EPA and CARB an explanation and description of the reasons for the delay; the anticipated duration of the delay; all actions taken or to be taken to prevent or minimize the delay; a schedule for implementation of any measures to be taken to prevent or mitigate the delay or the effect of the delay; Defendant's rationale for attributing such delay to a force majeure event if it intends to assert such a claim; and a statement as to whether, in the opinion of Defendant, such event may cause or contribute to an endangerment to public health, welfare or the environment. Defendant shall include with any notice all available documentation supporting the claim that the delay was attributable to a force majeure. Failure to comply with the above requirements shall preclude Defendant from asserting any claim of force majeure for that event for the period of time of such failure to comply, and for any additional delay caused by such failure. Defendant shall be deemed to know of any circumstance of which Defendant, any entity controlled by Defendant, or Defendant's contractors knew or should have known.

52.     If EPA and CARB agree that the delay or anticipated delay is attributable to a force majeure event, the time for performance of the obligations under this Consent Decree that are affected by the force majeure event will be extended by EPA and CARB for such time as is necessary to complete those obligations. An extension of the time for performance of the obligations affected by the force majeure event shall not, of itself, extend the time for performance of any other obligation. EPA and/or CARB will notify Defendant in writing of the length of the extension, if any, for performance of the obligations affected by the force majeure event.

53.     If EPA or CARB disagrees that the delay or anticipated delay has been or will be caused by a force majeure event, EPA or CARB will notify Defendant in writing of the decision.

54.     If Defendant elects to invoke the dispute resolution procedures set forth in Section X (Dispute Resolution), it shall do so no later than 15 Days after receipt of the notice. In any such proceeding, Defendant shall have the burden of demonstrating by a preponderance of the evidence that the delay or anticipated delay has been or will be caused by a force majeure event, that the duration of the delay or the extension sought was or will be warranted under the circumstances, that best efforts were exercised to avoid and mitigate the effects of the delay, and that Defendant complied with the requirements of Paragraphs 50 and 51. If Defendant carries this burden, the delay at issue shall be deemed not to be a violation by Defendant of the affected obligation of this Consent Decree.

## X.     DISPUTE RESOLUTION

55.     Unless otherwise expressly provided for in this Consent Decree, the dispute resolution procedures of this Section shall be the exclusive mechanism to resolve disputes arising under or with respect to this Consent Decree. Defendant's failure to seek resolution of a dispute under this Section shall preclude Defendant from raising any such issue as a defense to an action by the United States or CARB to enforce any obligation of Defendant arising under this Decree.

56.     Informal Dispute Resolution. Any dispute subject to Dispute Resolution under this Consent Decree shall first be the subject of informal negotiations. The dispute shall be considered to have arisen when Defendant sends the United States, EPA, the CA AG, and CARB a written Notice of Dispute. Such Notice of Dispute shall state clearly the matter in dispute including, where applicable, whether the dispute arises from a decision made by EPA and CARB jointly, or EPA or CARB individually. The period of informal negotiations shall not exceed 30 Days from the date the dispute arises, unless that period is modified by written agreement. If the Parties cannot resolve a dispute by informal negotiations, then the position advanced by the United States/CARB shall be considered binding unless, within 21 Days after the conclusion of

the informal negotiation period, Defendant invokes formal dispute resolution procedures as set forth below.

57.     Formal Dispute Resolution. Defendant shall invoke formal dispute resolution procedures, within the time period provided in the preceding Paragraph, by serving on the United States, EPA, the CA AG, and CARB a written Statement of Position regarding the matter in dispute. The Statement of Position shall include, but need not be limited to, any factual data, analysis, or opinion supporting Defendant's position and any supporting documentation relied upon by Defendant.

58.     The United States/CARB shall serve its/their Statement of Position within 45 Days of receipt of Defendant's Statement of Position. The United States'/CARB's Statement of Position shall include, but need not be limited to, any factual data, analysis, or opinion supporting that position and any supporting documentation relied upon by the United States/CARB. The United States' Statement of Position shall be binding on Defendant, unless Defendant files a motion for judicial review of the dispute in accordance with the following Paragraph.

59.     Defendant may seek judicial review of the dispute by filing with the Court and serving on the United States, EPA, the CA AG, and CARB, in accordance with Section XIV (Notices), a motion requesting judicial resolution of the dispute. In any such motion, Defendant shall be prohibited from raising issues that were not first raised during informal dispute resolution pursuant to Paragraph 56. The motion must be filed within 21 Days of receipt of the United States'/CARB's Statement of Position pursuant to the preceding Paragraph. The motion shall contain a written statement of Defendant's position on the matter in dispute, including any supporting factual data, analysis, opinion, or documentation, and shall set forth the relief requested and any schedule within which the dispute must be resolved for orderly implementation of the Consent Decree.

60.     The United States/CARB shall respond to Defendant's motion within the time period allowed by the Local Rules of this Court. Defendant may file a reply memorandum to the extent permitted by the Local Rules.

61.     <u>Standard of Review</u>

a.     <u>Disputes Concerning Matters Accorded Record Review</u>. Except as otherwise provided in this Consent Decree, in any dispute brought under Paragraph 57 pertaining to the adequacy or appropriateness of plans, procedures to implement plans, schedules or any other items requiring approval by EPA and CARB under Paragraphs 19-20 of this Consent Decree, or the adequacy of the performance of work undertaken pursuant to Paragraphs 19-20 and 26-27 of this Consent Decree, Defendant shall have the burden of demonstrating, based on the administrative record, that the action, determination, or position of the United States and CARB is arbitrary and capricious or otherwise not in accordance with law.

b.     <u>Other Disputes</u>. Except as otherwise provided in this Consent Decree, in any other dispute brought under Paragraph 57, Defendant shall bear the burden of demonstrating by a preponderance of the evidence that its position complies with this Consent Decree and better furthers the objectives of the Consent Decree.

62.     In any disputes brought under this Section, it is hereby expressly acknowledged and agreed that this Consent Decree was jointly drafted in good faith by the Parties. Accordingly, the Parties hereby agree that any and all rules of construction to the effect that ambiguity is construed against the drafting party shall be inapplicable in any dispute concerning the terms, meaning, or interpretation of this Consent Decree.

63.     The invocation of dispute resolution procedures under this Section shall not, by itself, extend, postpone, or affect in any way any obligation of Defendant under this Consent Decree, unless and until final resolution of the dispute so provides. Stipulated penalties with respect to the disputed matter shall continue to accrue from the first Day of noncompliance, but

payment shall be stayed pending resolution of the dispute as provided in Paragraph 44. If Defendant does not prevail on the disputed issue, stipulated penalties shall be assessed and paid as provided in Section VIII (Stipulated Penalties).

## XI.   INFORMATION COLLECTION AND RETENTION

64.     The United States, CARB, and their representatives, including attorneys, contractors, and consultants, shall have the right of entry into any facility covered by this Consent Decree, at all reasonable times, upon presentation of credentials, to:

a.     monitor the progress of activities required under this Consent Decree;

b.     inspect records related to this Consent Decree;

c.     verify any data or information submitted to the United States or CARB in accordance with the terms of this Consent Decree;

d.     observe emissions testing performed by Defendant or its representatives, contractors, or consultants;

e.     require that Defendant provide or make available any Small SI Engine for confirmation testing by EPA and CARB;

f.     obtain documentary evidence, including photographs and similar data related to implementation of this Consent Decree;

g.     assess Defendant's compliance with this Consent Decree; and

h.     for all other purposes as set forth in the 42 U.S.C. § 7542(b) and Cal. Gov't Code § 11180.

65.     Until three years after termination of this Consent Decree, Defendant shall retain, and shall instruct its contractors and agents to preserve, all non-identical copies of all documents, records, reports, or other information (including documents, records, or other information in electronic form) in its or its contractors' or agents' possession or control, or that come into its or its contractors' or agents' possession or control, and that relate in any manner to Defendant's

performance of its obligations under this Consent Decree. This information-retention requirement shall apply regardless of any contrary corporate or institutional policies or procedures. At any time during this information-retention period, upon request by the United States or CARB, Defendant shall provide copies of any documents, records, or other information required to be maintained under this Paragraph.

66.     At the conclusion of the information-retention period provided in the preceding Paragraph, Defendant shall notify the United States and CARB at least 90 Days prior to the destruction of any documents, records, or other information subject to the requirements of the preceding Paragraph and, upon request by the United States or CARB, Defendant shall deliver any such documents, records, or other information to EPA or CARB.

67.     With respect to any submission of information or request for information under this Consent Decree, Defendant may assert that certain documents, records, or other information is privileged under the attorney-client privilege or any other privilege recognized by federal or California law. If Defendant asserts such a privilege, it shall provide the following:  (a) the title of the document, record, or information; (b) the date of the document, record, or information; (c) the name and title of each author of the document, record, or information; (d) the name and title of each addressee and recipient; (e) a description of the subject of the document, record, or information; and (f) the privilege asserted by Defendant. However, no documents, records, or other information created or generated pursuant to the requirements of this Consent Decree shall be withheld on grounds of privilege.

68.     Defendant may also assert that information required to be provided under this Section is protected as Confidential Business Information ("CBI") under 40 C.F.R. Part 2 or equivalent California law as applicable. As to any information that Defendant seeks to protect as CBI, Defendant shall follow the procedures set forth in 40 C.F.R. Part 2. If no claim of

1  confidentiality accompanies records when they are submitted to EPA and/or CARB, the public

2  may be given access to the records without further notice to the Defendant.

3      69.    This Consent Decree in no way limits or affects any right of entry and inspection,

4  or any right to obtain information, held by the United States or CARB pursuant to applicable

5  federal or state laws, regulations, or permits, nor does it limit or affect any duty or obligation of

6  Defendant to maintain documents, records, or other information imposed by applicable federal or

7  state laws, regulations, or permits.

8           **XII.   EFFECT OF SETTLEMENT/RESERVATION OF RIGHTS**

9      70.    This Consent Decree resolves the civil claims of Plaintiffs for the violations

10  alleged in the Complaint filed in this action through the date of lodging, except for violations

11  alleged only by CARB in the ninth claim of the Complaint related to Defendant's evaporative

12  emissions, which Defendant and CARB are resolving separately. Plaintiffs reserve and this

13  Consent Decree is without prejudice to all claims, rights, and remedies against Defendant with

14  respect to all matters not expressly resolved in this Consent Decree.

15      71.    Defendant agrees not to contest the revocation by OTAQ of COCs EPA issued for

16  Defendant's Model Year 2016 engine families designated GKHXS.6942PC, GKHXS.7472NC,

17  GKHXS.7472ND, GKHXS.8242ND, and GKHXS.8242PD. Defendant cannot use emissions

18  data from these engine families to certify any engine family after the Effective Date either

19  through EPA or through CARB.

20      72.    The United States reserves all legal and equitable remedies available to enforce

21  the provisions of this Consent Decree. This Consent Decree shall not be construed to limit the

22  rights of the United States to obtain penalties or injunctive relief under the Act and its

23  implementing regulations, or under other federal laws, regulations, or permit conditions,

24  including for violations identified through the emissions testing validation and annual

25  compliance auditing required by Paragraphs 19-20. The United States further reserves all legal

and equitable remedies to address any imminent and substantial endangerment to the public health or welfare or the environment whether related to the violations addressed in this Consent Decree or otherwise.

73. CARB reserves all legal and equitable remedies available to enforce the provisions of this Consent Decree. This Consent Decree shall not be construed to limit the rights of CARB to obtain penalties or injunctive relief under the California Health and Safety Code, and its implementing regulations, or under other state laws, regulations, or permit conditions, including for violations identified through the emissions testing validation and annual compliance auditing required by Paragraphs 19-20. CARB further reserves all legal and equitable remedies to address any imminent and substantial endangerment to the public health or welfare or the environment whether related to the violations addressed in this Consent Decree or otherwise.

74. In any subsequent administrative or judicial proceeding initiated by the United States or CARB for injunctive relief, civil penalties, other appropriate relief relating to Defendant's violations, Defendant shall not assert, and may not maintain, any defense or claim based upon the principles of waiver, res judicata, collateral estoppel, issue preclusion, claim preclusion, claim-splitting, or other defenses based upon any contention that the claims raised by the United States or CARB in the subsequent proceeding were or should have been brought in the instant case, except with respect to claims that have been specifically resolved pursuant to Paragraph 70.

75. This Consent Decree is not a permit, or a modification of any permit, under any federal, State, or local laws or regulations. Defendant is responsible for achieving and maintaining complete compliance with all applicable federal, State, and local laws, regulations, and permits; and Defendant's compliance with this Consent Decree shall be no defense to any action commenced pursuant to any such laws, regulations, or permits, except as set forth herein.

The United States and CARB do not, by their consent to the entry of this Consent Decree, warrant or aver in any manner that Defendant's compliance with any aspect of this Consent Decree will result in compliance with provisions of the Act and the California Health and Safety Code, or their implementing regulations, or with any other provisions of federal, State, or local laws, regulations, or permits.

76.   This Consent Decree does not limit or affect the rights of Defendant or of the United States or CARB against any third parties, not party to this Consent Decree, nor does it limit the rights of third parties, not party to this Consent Decree, against Defendant, except as otherwise provided by law.

77.   This Consent Decree shall not be construed to create rights in, or grant any cause of action to, any third party not party to this Consent Decree.

## XIII.   COSTS

78.   The Parties shall bear their own costs of this action, including attorneys' fees, except that the United States and CARB shall be entitled to collect the costs (including attorneys' fees) incurred in any action necessary to collect any portion of the civil penalty or any stipulated penalties due but not paid by Defendant.

## XIV.   NOTICES

79.   Unless otherwise specified in this Decree, whenever notifications, submissions, or communications are required by this Consent Decree, they shall be submitted electronically as described below, unless such notices are unable to be uploaded in the CDX electronic system (in the case of EPA) or transmitted by email (in the case of any other Party). For all notices to EPA, Defendant shall register for the CDX electronic system and upload such notices at https://cdx.epa.gov. Any notice that cannot be uploaded or transmitted via email shall be provided in writing (and if any attachment is voluminous, it shall be provided on a disk, hard drive, or other equivalent successor technology) to the addresses below:

| | | |
|---|---|---|
| As to the United States by email: | Patricia.Hurst@usdoj.gov | |
| | eescdcopy.enrd@usdoj.gov | |
| | Re: DJ # 90-5-2-1-11892 | |

As to the United States by mail: EES Case Management Unit
Environment and Natural Resources Division
U.S. Department of Justice
P.O. Box 7611
Washington, D.C. 20044-7611
Re: DJ # 90-5-2-1-11892

As to EPA by email: Bickmore.Ryan@epa.gov

As to EPA by mail: Director
Enforcement and Compliance Assurance Division
U.S. Environmental Protection Agency, Region 9
75 Hawthorne St.
San Francisco, CA 94105

As to CARB by email: Shannon.Dilley@arb.ca.gov
Marco.Banaga@arb.ca.gov

As to CARB by mail: Shannon Martin Dilley
Senior Counsel
California Air Resources Board
Legal Office
1001 I Street
Sacramento, CA 95814
(916) 322-3940

Marco Banaga
Air Pollution Specialist
California Air Resources Board
9480 Telstar Avenue, No. 4
El Monte, CA 91731
(626) 450-6270

As to CA AG by email: Kurt.weissmuller@doj.ca.gov
Josh.Caplan@doj.ca.gov

As to CA AG by mail: Kurt Weissmuller
Deputy Attorney General
Office of the California Attorney General
300 S. Spring Street, Suite 1702
Los Angeles, CA 90013

1

(213) 269-6353

2

Joshua M. Caplan
Deputy Attorney General

3

Office of the California Attorney General
600 West Broadway, Suite 1800

4

San Diego, CA 92816-5266
(619) 738-9303

5

6

As to Defendant by mail:      Natalie Maciolek
                               VP - General Counsel and Corporate Secretary
                               Kohler Co.

7

444 Highland Dr.
Kohler, WI 53044

8

(920) 457-4441

9

Michael Read
Director - Product Compliance

10

Kohler Co.

11

444 Highland Dr. MS100,
Kohler, WI 53044

12

(920) 453-6398

13

As to Defendant by email:      Natalie.Maciolek@kohler.com
                                Michael.Read@kohler.com

14

80.      Any Party may, by written notice to the other Parties, change its designated notice

15

recipient or notice address provided above.

16

81.      Notices submitted pursuant to this Section shall be deemed submitted upon

17

uploading electronically, emailing, or mailing as required, except as provided elsewhere in this

18

Consent Decree or by mutual agreement of the Parties in writing.

19

## XV.    EFFECTIVE DATE

20

82.      The Effective Date of this Consent Decree shall be the date upon which this

21

Consent Decree is entered by the Court or a motion to enter the Consent Decree is granted,

22

whichever occurs first, as recorded on the Court's docket.

23

24

25

44

## XVI.   RETENTION OF JURISDICTION

83.     The Court shall retain jurisdiction over this case until termination of this Consent Decree, for the purpose of resolving disputes arising under this Consent Decree or entering orders modifying this Consent Decree, pursuant to Sections X and XVII, or effectuating or enforcing compliance with the terms of this Consent Decree.

## XVII.  MODIFICATION

84.     The terms of this Consent Decree, including any attached appendices, may be modified only by a subsequent written agreement signed by all the Parties. Where the modification constitutes a material change to this Consent Decree, it shall be effective only upon approval by the Court.

85.     Any disputes concerning modification of this Decree shall be resolved pursuant to Section X (Dispute Resolution), provided, however, that, instead of the burden of proof provided by Paragraph 61, the Party seeking the modification bears the burden of demonstrating that it is entitled to the requested modification in accordance with Federal Rule of Civil Procedure 60(b).

## XVIII. TERMINATION

86.     After Defendant has completed the requirements of Section V (Compliance Measures), Section VI (Correction of ABT Reports), and Section VII (Reporting Requirements); has maintained continuous satisfactory compliance with this Consent Decree for a period of three years; and has paid the civil penalty and any accrued stipulated penalties as required by this Consent Decree, Defendant may serve upon the United States and CARB a Request for Termination, stating that Defendant has satisfied those requirements, together with all necessary supporting documentation.

87.     Following receipt by the United States and CARB of Defendant's Request for Termination, the Parties shall confer informally concerning the Request and any disagreement that the Parties may have as to whether Defendant has satisfactorily complied with the

45

1   requirements for termination of this Consent Decree. If the United States and CARB agree that

2   the Decree may be terminated, the Parties shall submit, for the Court's approval, a joint

3   stipulation terminating the Decree.

4       88.     If the United States or CARB disagrees that the Decree may be terminated,

5   Defendant may invoke Dispute Resolution under Section X. However, Defendant shall not seek

6   Dispute Resolution of any dispute regarding termination until 60 Days after service of its

7   Request for Termination.

8                    **XIX.   PUBLIC PARTICIPATION**

9       89.     This Consent Decree shall be lodged with the Court for a period of not less than

10  30 Days for public notice and comment in accordance with 28 C.F.R. § 50.7. The United States

11  reserves the right to withdraw or withhold its consent if the comments regarding the Consent

12  Decree disclose facts or considerations indicating that the Consent Decree is inappropriate,

13  improper, or inadequate. CARB reserves the right to withdraw or withhold its consent if the

14  United States does so. Defendant consents to entry of this Consent Decree without further notice

15  and agrees not to withdraw from or oppose entry of this Consent Decree by the Court or to

16  challenge any provision of the Consent Decree, unless the United States has notified Defendant

17  in writing that it no longer supports entry of the Consent Decree.

18                   **XX.   SIGNATORIES/SERVICE**

19      90.     Each undersigned representative of Defendant, the Assistant Attorney General for

20  the Environment and Natural Resources Division of the Department of Justice, the Attorney

21  General for the State of California, and CARB, certifies that he or she is fully authorized to enter

22  into the terms and conditions of this Consent Decree and to execute and legally bind the Party he

23  or she represents to this document.

24      91.     This Consent Decree may be signed in counterparts, and its validity shall not be

25  challenged on that basis.

46

92.     Defendant agrees to accept service of process by mail with respect to all matters arising under or relating to this Consent Decree and to waive the formal service requirements set forth in Rules 4 and 5 of the Federal Rules of Civil Procedure and any applicable Local Rules of this Court including, but not limited to, service of a summons. Defendant need not file an answer to the complaint in this action unless or until the Court expressly declines to enter this Consent Decree.

## XXI.   INTEGRATION

93.     This Consent Decree constitutes the final, complete, and exclusive agreement and understanding among the Parties with respect to the settlement embodied in the Consent Decree and supersedes all prior agreements and understandings, whether oral or written, concerning the settlement embodied herein. Other than Deliverables that are subsequently submitted and approved pursuant to this Consent Decree, the Parties acknowledge that there are no documents, representations, inducements, agreements, promises, or understandings relating to the settlement other than those expressly contained in this Consent Decree.

94.     The Parties acknowledge that Defendant and CARB are separately resolving violations alleged only by CARB in the ninth claim of the Complaint regarding Defendant's evaporative emissions. Any agreement or understanding reached by Defendant and CARB with respect to resolution of the allegations made by CARB in the ninth claim of the Complaint is separate from, and not integrated with, this Consent Decree.

## XXII.  FINAL JUDGMENT

95.     Upon approval and entry of this Consent Decree by the Court, this Consent Decree shall constitute a final judgment of the Court as to the United States, CARB, and Defendant.

1

## XXIII. 26 U.S.C. SECTION 162(f)(2)(A)(ii) IDENTIFICATION

2    96.    For purposes of the identification requirement of Section 162(f)(2)(A)(ii) of the

3  Internal Revenue Code, 26 U.S.C. § 162(f)(2)(A)(ii), performance of Section II (Applicability),

4  Paragraph 7; Section V (Compliance Measures), Paragraphs 16-19, 20 (except with respect to the

5  disapproval of Action Plans), 21-22; Section VII (Reporting Requirements), Paragraphs 29

6  (except with respect to reporting on Correction of ABT Reports), 31-32; and Section XI

7  (Information Collection and Retention), Paragraphs 64-66; is restitution or required to come into

8  compliance with law.

9

10                          Dated and entered this __ day of _____, 2020.

11

12

13                          _____
                            UNITED STATES DISTRICT JUDGE

14

15

16

17

18

19

20

21

22

23

24

25

1   THE UNDERSIGNED PARTY enters into this Consent Decree in the matter of *United States et*
2   *al. v. Kohler Co.*.

3   FOR THE UNITED STATES OF AMERICA:

4

5   Date: __1/29/20__

6                             JEFFREY BOSSERT CLARK
                              Assistant Attorney General
7                               Environment and Natural Resources Division
                              U.S. Department of Justice

8

9

10                              PATRICIA L. HURST (DCBN 438882)
                              Senior Counsel
11                               Environmental Enforcement Section
                              Environment and Natural Resources Division
12                              U.S. Department of Justice

13

14
  Date: _____
15                              DAVID L. ANDERSON
                             United States Attorney
16                              SARA WINSLOW (DCBN 457643)
                             Chief, Civil Division
17                              MICHELLE LO (NYBN 4325163)
                             Assistant United States Attorney
18

19

20

21

22

23

24

25

49

1  THE UNDERSIGNED PARTY enters into this Consent Decree in the matter of *United States et*
2  *al. v. Kohler Co.*.

3  FOR THE UNITED STATES OF AMERICA:

4

5  Date: _____

6
                JEFFREY BOSSERT CLARK
                Assistant Attorney General
                Environment and Natural Resources Division
7                  U.S. Department of Justice

8

9

10                 PATRICIA L. HURST (DCBN 438882)
                Senior Counsel
11                 Environmental Enforcement Section
                Environment and Natural Resources Division
12                 U.S. Department of Justice

13

14 Date: 01/28/2020

15                 DAVID L. ANDERSON
                United States Attorney
16                 SARA WINSLOW (DCBN 457643)
                Chief, Civil Division
17                 MICHELLE LO (NYBN 4325163)
                Assistant United States Attorney
18

19

20

21

22

23

24

25

49

1   THE UNDERSIGNED PARTY enters into this Consent Decree in the matter of *United States et*
2   *al. v. Kohler Co..*

3   FOR THE U.S. ENVIRONMENTAL PROTECTION AGENCY:

4
5   Date: 1/29/2020                          _Susan Parker Bodine_
6                                            SUSAN PARKER BODINE
                                             Assistant Administrator
7                                            Office of Enforcement and Compliance Assurance
                                             U.S. Environmental Protection Agency
8                                            1200 Pennsylvania Avenue, N.W.
                                             Washington, DC 20460
9
10  Date: 1/27/2020                          _Rosemarie Kelley_
                                             ROSEMARIE A. KELLEY
11                                           Director, Office of Civil Enforcement
                                             Office of Enforcement and Compliance Assurance
12                                           U.S. Environmental Protection Agency
                                             1200 Pennsylvania Avenue, N.W
13                                           Washington, DC 20460
14
15  Date: 1/13/2020                          _Phillip A. Brooks_
                                             PHILLIP A. BROOKS
16                                           Director, Air Enforcement Division
                                             EVAN BELSER
17                                           Associate Director, Air Enforcement Division
                                             Office of Civil Enforcement
18                                           Office of Enforcement and Compliance Assurance
                                             U.S. Environmental Protection Agency
19                                           1200 Pennsylvania Avenue, N.W
                                             Washington, DC 20460
20
21
22
23
24
25

                                    50

1   THE UNDERSIGNED PARTY enters into this Consent Decree in the matter of *United States et*
2   *al. v. Kohler Co.*.

3   FOR THE U.S. ENVIRONMENTAL PROTECTION AGENCY REGION 9:

4

5   Date: January 13, 2020
6                                    SYLVIA QUAST
7                                    Regional Counsel
                                     U.S. Environmental Protection Agency, Region 9
8                                    Office of Regional Counsel
                                     75 Hawthorne St.
9                                    San Francisco, CA 94105

10

11  OF COUNSEL:

12  RYAN BICKMORE
    Attorney-Advisor
13  U.S. Environmental Protection Agency, Region 9
    75 Hawthorne Street (ORC-2-2)
14  San Francisco, CA 94105

15

16

17

18

19

20

21

22

23

24

25

51

1   THE UNDERSIGNED PARTY enters into this Consent Decree in the matter of *United States et*
2   *al. v. Kohler Co.*.

3   FOR THE CALIFORNIA OFFICE OF THE ATTORNEY GENERAL:

4

5   Date: 1/28/2020

6                                          KURT WEISSMULLER (CABN 117187)
7                                          Deputy Attorney General
                                           Office of the California Attorney General
8                                          300 S. Spring Street, Suite 1702
                                           Los Angeles, CA 90013
9                                          Kurt.Weissmuller@doj.ca.gov
                                           Phone: (213) 269-6353
10                                         Fax: (213) 897-2802

11

12  Date: 1/28/2020

13                                         JOSHUA M. CAPLAN (CABN 245469)
                                           Deputy Attorney General
14                                         Office of the California Attorney General
                                           600 West Broadway, Suite 1800
15                                         San Diego, CA 92816-5266
                                           Josh.Caplan@doj.ca.gov
16                                         Phone: (619) 738-9303
                                           Fax: (619) 645-2271

17

18

19

20

21

22

23

24

25

                                52

THE UNDERSIGNED PARTY enters into this Consent Decree in the matter of *United States et al. v. Kohler Co.*.

FOR THE CALIFORNIA AIR RESOURCES BOARD:

Date: 1/22/2020

MARY D. NICHOLS
Chair
California Air Resources Board
1001 I Street
Sacramento, CA 95814

Date: 1/22/2020

RICHARD W. COREY
Executive Officer
California Air Resources Board
1001 I Street
Sacramento, CA 95814

Date: 1/22/2020

ELLEN M. PETER
Chief Counsel
D. ARON LIVINGSTON
Assistant Chief Counsel
SHANNON MARTIN DILLEY (CABN 297804)
Senior Counsel
California Air Resources Board
Legal Office
1001 I Street
Sacramento, CA 95814
shannon.dilley@arb.ca.gov
Phone: (916) 322-3940
Fax: (916) 322-3928

53

1 THE UNDERSIGNED PARTY enters into this Consent Decree in the matter of *United States et*
2 *al. v. Kohler Co.*

3 FOR KOHLER CO.:

4

5 Date: 1/29/20     *Natalie Maciolek*
6      NATALIE MACIOLEK
7      VP - General Counsel and Corporate Secretary
     Kohler Co.
     444 Highland Dr.
8      Kohler, WI 53044
     Natalie.Maciolek@kohler.com
9      Phone: (920) 457-4441

10

54